UNITED STATES of America, Plaintiff–
Appellee, Cross–Appellant,

v.

Jerry B. KRAIG, Defendant–Appellant,
Cross–Appellee.

Nos. 95–3734, 95–3771.

United States Court of Appeals,
Sixth Circuit.

Argued June 3, 1996.

Decided Nov. 8, 1996.

James R. Wooley, Asst. U.S. Attorney, Craig S. Morford (argued and briefed), Office of the U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee, Cross–Appellant.

H. Louis Sirkin (argued), Marc D. Mezibov, Laura A. Abrams (briefed), Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, for Defendant–Appellant, Cross–Appellee.

Before: MERRITT and COLE, Circuit Judges; ECHOLS, District Judge.*

MERRITT, Circuit Judge.

Defendant Jerry Kraig, a lawyer, was convicted by a jury of a single count of conspiracy in assisting to conceal assets of Reuben Sturman (not a defendant herein) from the Internal Revenue Service, thereby preventing the ascertainment, computation and collection of taxes in violation of 18 U.S.C. § 371. Defendant was sentenced to 30 months in prison. He appeals his conviction and sentence. The government cross-appeals the sentence. We affirm both the conviction and the sentence.

I.

In the years before the advent of the conspiracy at issue here, Reuben Sturman was a nationwide manufacturer, distributor and marketer of adult entertainment material throughout the United States. In 1985, Sturman was indicted on 16 counts of tax evasion and related offenses. Sturman was

---

* The Honorable Robert L. Echols, United States District Judge for the Middle District of Tennessee, sitting by designation.

convicted of all charges in 1989 in one of the largest tax evasion cases in the history of the IRS and his conviction was affirmed by this Court. *United States v. Sturman*, 951 F.2d 1466 (6th Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992).

The Defendant herein, Jerry Kraig, was Sturman's lawyer. Kraig was convicted of helping Sturman fraudulently conceal his assets, mainly real estate, through foreign "shell" corporations. Three other persons were also indicted with Kraig, as well as unnamed coconspirators. One of the coconspirators pled guilty and the other two went to trial separately from Kraig. This appeal concerns only Defendant Jerry Kraig.

Kraig was a lawyer with a small personal injury and criminal practice in Cleveland, Ohio. In 1982, Sturman hired Kraig to do First Amendment work for him relating to Sturman's business. As a result, Kraig moved part of his law offices into Sturman's headquarters in Cleveland.

In 1984, Kraig referred Sturman to Robert Garfield, another Cleveland lawyer and a close personal friend of Kraig's, to do tax and estate planning work for Sturman. Kraig testified that he believed Sturman wanted to establish a trust from various real estate holdings for the benefit of Sturman's children. Kraig served as Garfield's contact with the Sturman organization. Garfield Tr. at 88–89, Joint Appendix at 353–54.[1]

In 1986, Kraig, on behalf of Sturman, retained the services of a Panamanian law firm for the purpose of forming a corporation named Gemstone Realty Corporation. The lawyer whom he contacted was named Horatio Alfaro, one of the codefendants herein. During 1986, Kraig provided the necessary information to Alfaro to set up the corporation. Kraig instructed the Panamanian firm to send the Gemstone stock to a Swiss attorney to hold on behalf of Sturman. Offshore bank accounts, to which Sturman had access, were also opened in Gemstone's name. The coconspirators attempted to hide Sturman's ownership by making it appear as though Gemstone was owned by a foreign trust controlled by a Swiss citizen instead of by Sturman. Gov't Ex. 57, J.A. at 224. Kraig was the contact person between Sturman and the Panamanian law firm and Kraig received and reviewed the invoices sent by the Panamanian firm for the work it was doing relating to Gemstone. Ginsberg Tr. at 205, J.A at 403.

In advising Sturman about estate planning, Garfield initially suggested a domestic trust and not a foreign trust because a foreign entity could easily hide assets. In 1986, however, Sturman told Garfield to transfer properties to Gemstone. The transfers were to be made without disclosing Sturman's ownership of the properties. Garfield resigned in 1986 when he learned that the IRS had begun to investigate Sturman in 1985. He testified that he suspected that the project for which he had been hired might be a tax evasion plan. Garfield Tr. at 90–91, J.A. at 355–56. Garfield also testified that he advised Kraig to resign also so he would not get caught up in Sturman's "net."

Garfield testified that he doesn't remember if he ever talked to Kraig about the specifics of Sturman's relationship to Gemstone but states that he "probably" did. Garfield Tr. at 94–95, J.A. at 259–60. Garfield also testified that he did express his general concerns about Sturman to Kraig. Garfield Tr. at 94, 124, J.A. at 359, 371. Furthermore, Garfield sent memos to Kraig describing some of the problems relating to the Gemstone transfers. (Garfield Tr. at 96, J.A. at 361). Garfield testified that after he resigned, Kraig told him that the files on the asset transfer project were to be assigned to another Cleveland lawyer named Marvin Ginsberg, a codefendant in this case. Ginsberg later pled guilty to the conspiracy charge and testified against his codefendants.

Ginsberg testified that when he was arranging the property transfers, Kraig was the person to whom he turned when he needed information about Gemstone. Kraig went over all the transactions concerning Gemstone with Ginsberg. *See, e.g.,* Ginsberg Tr. at 207, 217–18, 220–22, J.A. at 405, 415–16,

---

1. References to the Joint Appendix filed in this case hereinafter will be referred to a "J.A. at ___."

418–20. In 1988, Ginsberg began working directly with Horatio Alfaro, the Panamanian lawyer, to make the transfers and not always going through Kraig.

As to ownership of the trust, Ginsberg testified that at a March 1989 meeting he attended with Kraig, he learned that there was no trust and that Reuben Sturman was the beneficial owner of Gemstone. Ginsberg Tr. at 194–95, J.A. at 392–93. Kraig contends that he always believed there was a legitimate trust and that it was not beneficially owned by Sturman. Ginsberg testified to facts from which a jury could legitimately infer that Kraig must have known that there was no trust because Kraig also attended the same meeting where Ginsberg discovered there was no trust. *Id.*

In addition to hiding the assets from his real estate holdings through Gemstone, Sturman also sold his adult bookstores and attempted to hide the income from these sales. The evidence also supports the inference that Sturman sold the bookstores after his indictment so that, in the event he was convicted, the IRS would not discover and attach his property in order to pay the taxes owed.

The government showed that Kraig also took part in this portion of the conspiracy. For example, in 1988, Kraig prepared a contract indicating that one of Sturman's employees, John Bordone, was purchasing adult bookstores from Eduardo Stockali, one of the coconspirators in this action. In fact, Sturman, not Stockali, owned the stores. Bordone made installment payments on the stores he had purchased. Bordone testified that he sent the checks, which were made out to Stockali, to Kraig in Cleveland. Kraig forwarded the checks to Stockali for deposit in one of the Swiss offshore accounts set up on behalf of Sturman by the Panamanian law firm. Kraig accepted these payments from Bordone between 1988 and 1991. Bordone Tr. at 49–69, J.A. at 239–59.

In 1990, after Sturman was convicted, the IRS entered a large tax assessment against Sturman and proceeded to try to collect the amount through levies and liens on Sturman's properties, including Gemstone. Sturman, through the coconspirators in this case, including Kraig, hired two Cleveland lawyers, Frank DeSantis and Jim Scott, to file lawsuits against the United States to challenge the tax levies and for wrongful prosecution. The new lawyers said they would only take the case if it could be demonstrated that Sturman was not the beneficial owner of Gemstone. Ginsberg Tr. at 241–45, J.A. at 435–43. Kraig testified that he told the new lawyers that he thought the trust was owned by Sturman for the benefit of Sturman's children but "he wasn't sure." DeSantis Tr. 336, 366, J.A. at 267, 297. One of the lawyers testified at trial that Kraig "assured" him that Sturman was not the owner. DeSantis Tr. 336–43, 406–07, J.A. at 267–74, 302–03. In 1991, Kraig met with Ginsberg and Horatio Alfaro, the Panamanian lawyer and a coconspirator in this case, to decide what information about Gemstone to turn over to the newly-hired lawyers for purposes of the suit against the United States.

Kraig prepared a memorandum for Sturman advising him that to prevail in a wrongful levy action against the IRS, he would need to show that someone else owned Gemstone or to show that Gemstone is fully owned by an irrevocable trust. As mentioned above, Ginsberg testified that Kraig had known since at least a 1989 meeting that both Ginsberg and Kraig attended with Sturman that Gemstone was not owned by a trust. Ginsberg Tr. at 256–64, J.A. at 454–62. Ginsberg ultimately drafted a false affidavit stating that a Swiss citizen named Thomas Kummer was the owner of Gemstone and that Sturman had no ownership interest in Gemstone. Ginsberg Tr. at 253, J.A at 451; Gov't Ex. 64, J.A. at 234. This affidavit was presented to the IRS by the new lawyers as proof that Sturman did not own Gemstone. The new lawyers, however, went to Switzerland to meet with the alleged owner of the trust and discovered that Sturman was in fact the beneficial owner of Gemstone. The new lawyers resigned. Ginsberg Tr. 180, DeSantis Tr. at 361–62, J.A. at 328, 292–93.

Kraig was tried separately from his codefendants and was convicted by a jury in April 1995. He was sentenced after a hearing to 30 months in jail, three years supervisory release and a $10,000 fine.

## II.

### A. *The Conviction*

#### 1. *Motion to Dismiss the Indictment*

Kraig first contends that the indictment should have been dismissed. The indictment charged Kraig with conspiracy pursuant to 18 U.S.C. § 371, which states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined. . . .

Section 371 prohibits two kinds of conspiracies: (1) conspiracies to commit a specific offense against the United States and (2) conspiracies to defraud the United States. In order to charge a violation under section 371, the government must show that the defendant conspired to commit one or more substantive offenses against the United States or that the defendant conspired to defraud the government in any manner for any purpose.

■ Kraig was charged under the defraud portion of the statute. The indictment under which Kraig was charged states that he

did unlawfully, knowingly and willfully conspire, combine, confederate and agree [with other named and unnamed defendants] to defraud the United States of America by hampering, hindering, impeding, impairing, obstructing and defeating the lawful functions of the [IRS] in the ascertainment, computation and collection of income taxes [in violation of 18 U.S.C. § 371].

Indictment at ¶ 1, J.A. at 18–19. Relying on *United States v. Minarik*, 875 F.2d 1186 (6th Cir.1989), Kraig contends that at most he could be convicted under the "offense" clause of Section 371 because the evidence demonstrated only that he had conspired to commit a violation of 26 U.S.C. § 7206(4) by concealing assets upon which the IRS may impose a levy for taxes owed. That statute criminalizes the removal or concealment of any good, commodity or property upon which levy is authorized with intent to evade or defeat assessment or collection of any tax.

■ *Minarik* held that conspiracy to commit an offense against the United States and conspiracy to defraud the United States under section 371 are two separate crimes and the government must allege and prove violation of one clause or the other. Specifically, *Minarik* held that a defendant must be charged with a conspiracy to commit an offense against the government and not a conspiracy to defraud if there is a specific statute describing the conduct involved in the alleged conspiracy. 875 F.2d at 1193–94.

In *Minarik*, one of the defendants had been issued a tax assessment. The defendant responded that she did not owe the tax. The defendant then arranged to sell a house she owned and received the payment by seven installment checks of less than $5,000 each. When she tried to cash the checks, the bank contacted the IRS and she was arrested for violating the Bank Secrecy Act which requires the filing of a report with the IRS for any transaction over $10,000. The defendant was charged under section 371 for conspiring to defraud the government by concealing from the government the nature of and income from a business. The indictment did not make clear what function of the government the defendants were impeding.

The defendant in *Minarik* properly could have been charged under § 7206(4) of the Internal Revenue Code, which, as described above, makes it a felony to conceal any goods or commodities on which a tax or levy has been imposed. The *Minarik* Court, therefore, found that the facts proved a conspiracy under the "offense" clause of § 371 for violating § 7206(4) not the "defraud" clause as the indictment indicated and therefore dismissed the indictment. *Minarik* explained that the purpose of the "defraud" section of § 371 "was to reach conduct not covered elsewhere in the criminal code" and should not be used when a specific provision covers that conduct. 875 F.2d at 1194.

*Minarik* was concerned with whether the indictment adequately notified defendants of the charges against them, thereby prejudicing defendants ability to prepare for trial. The government changed its theory of the

case throughout the proceeding. This Court found that the prosecution used the defraud clause in a way that caused "great confusion about the conduct claimed to be illegal." *Id.* at 1196. *Minarik* states that "prosecutors and courts are required to determine and acknowledge exactly what the alleged crime is. They may not allow the facts to define the crime through hindsight after the case is over." *Id.*

At least two later Sixth Circuit cases have distinguished *Minarik: United States v. Sturman,* 951 F.2d 1466 (6th Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992) and *United States v. Mohney,* 949 F.2d 899 (6th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). These cases discuss *Minarik* extensively and distinguish *Minarik* on its facts. *See also United States v. Hurley,* 957 F.2d 1, 3–4 (1st Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992); *United States v. Notch,* 939 F.2d 895, 900–01 (10th Cir.1991); *United States v. Bilzerian,* 926 F.2d 1285, 1302 (2d Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991) (indictment under defraud clause proper where conduct broader than specific statutory provision).

In both *Sturman* and *Mohney,* the Court found that the conduct at issue satisfied the defraud clause of section 371. The conspiracies in these two cases, unlike *Minarik,* violated numerous tax statutes—not just one. The indictment in this case is identical to the indictment in the *Sturman* case. The conduct alleged in the indictment, if proven, violates more than one specific statute. The broad nature of the conspiracy distinguishes this case from *Minarik.*

Kraig contends, as did the defendants in *Minarik,* that § 7206(2) and (4) of the Internal Revenue Code cover the conduct for which Kraig was indicted and that at most he should have been charged under the "offense" clause of section 371 and not the "defraud" clause. Kraig contends that the government's theory presented at trial related solely to Kraig's concealment of Sturman's assets in order to defeat the tax liability imposed in 1990 and the government did not attempt to prove that Kraig had impeded the "ascertainment or computation" of taxes *prior to* the time the levy was imposed against Sturman.

■ The facts presented in this case are more analogous to those in *Sturman* and *Mohney* than *Minarik.* First, unlike *Minarik,* an indictment under the "defraud" clause of section 371 is proper here because the conduct undertaken by Kraig is broader than that encompassed solely by section 7206. Charging a defendant under the "defraud" clause of section 371 is appropriate when the conspiracy alleges violation of more than one statute. In *Minarik,* the conspiracy had the narrow objective of concealment of assets upon which the IRS was empowered to levy and arose from a single event—the sale of a house. That conduct was explicitly proscribed by 28 U.S.C. § 7206(4). In contrast, the government in this case alleges that Kraig and his coconspirators participated in a long-standing and wide-ranging scheme to deceive the IRS regarding the amount and source of Sturman's assets, including allegations of improper conduct *prior to* the levy of the tax liability against Sturman. No provision of the tax code covers the totality and scope of the conspiracy. The government contends that the members of the Sturman conspiracy violated several tax statutes including 26 U.S.C. § 7201 (evasion of assessment and payment of taxes), 26 U.S.C. § 7204 (concealing assets subject to levy), 26 U.S.C. § 7206 (concealment of assets after levy of tax) and 18 U.S.C. § 1001 (providing false information to the IRS). The indictment charged that the conspirators here, including Kraig, used nominees, sham transactions and others means of obstruction to keep the IRS from "ascertaining, computing and collecting" Sturman's taxes. Only the defraud clause can adequately cover all the aspects of the conspiracy in this case.

Second, unlike the indictment in *Minarik,* the indictment here gave Kraig adequate notice of the conduct constituting the charges against him. In *Minarik,* the indictment did not make clear what function of the Treasury Department the defendants were impeding and the government changed its theory of the case throughout the indictment process and trial. We concluded that the defendants

properly could have been charged under 28 U.S.C. § 7206(4) and therefore could not be charged under the defraud clause but convicted on evidence that supports the offense clause. When a statute closely describes the conduct that the defendant is accused of violating, we reasoned that requiring the indictment to charge the defendant with conspiracy to commit the specific crime reduces the uncertainty in the case.

Furthermore, unlike *Minarik*, the government did not shift its theory between the "offense" an "defraud" clauses of section 371. The government consistently has maintained that Kraig and the other coconspirators sought to deceive the IRS through an elaborate set up of offshore bank accounts and shell corporations.

Accordingly, because the conduct alleged in the indictment fits within the "defraud" section of section 371 and the indictment gave adequate notice of the charges against Kraig, the District Court did not err in denying the motion to dismiss the indictment.

### 2. *Sufficiency of the Evidence*

■ ▪ Kraig next asserts that the evidence is insufficient to support his jury conviction. The record, however, contains both direct evidence of Kraig's knowledge of the conspiracy and circumstantial evidence arising from Kraig's ongoing involvement in sham transactions over a number of years.

■ Evidence is sufficient to uphold a jury conviction if after viewing the evidence in the light most favorable to the government and drawing all inferences in the government's favor, a reasonable juror could find that each element of the offense has been established beyond a reasonable doubt. *United States v. Taylor*, 13 F.3d 986, 991 (6th Cir.1994).

■ When attempting to prove an individual's participation in a conspiracy, the government must first establish that a conspiracy existed. The essential elements of a conspiracy are: (1) the conspiracy described in the indictment was wilfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged. *United States v. Sturman*, 951 F.2d at 1474 (citations omitted).

Kraig contends that the government failed to prove that he intentionally joined or participated in a conspiracy to defraud the IRS. Kraig also seems to contend that lawyers are held to a different standard when evaluating their participation in a conspiracy. Kraig states: "the actions of a lawyer in representing his/her client can only create an inference that the attorney was connected to and a willing participant in a conspiracy if the evidence establishes that the attorney 'understood that [his/her] facially proper undertakings were part of [an illegal scheme.]'" Appellant's brief at 19 (citing *United States v. Klein*, 19 F.3d 20 (6th Cir.1994) (unpublished)). *Klein* holds that this understanding can only be inferred if the evidence establishes that (1) the lawyer's involvement in the operation of the illegal enterprise was so pervasive that his knowledge of its illegal nature was reasonably certain or (2) he misrepresented or actively concealed facts about the illegal enterprise. *Klein*, slip op. at 7–8 (the "sheer number" of transactions with which Klein was involved gave rise to an inference that Klein knowingly and wilfully participated in the conspiracy to defraud). Kraig contends that he meets neither of the *Klein* criteria.

■ First, to the extent that Kraig maintains that lawyers should be held to a different standard from nonlawyers, we disagree. The cases cited by Kraig do not establish any different standard for lawyers when reviewing their participation in a conspiracy. Second, as detailed below, it appears from the evidence that Kraig meets both criteria set out in the cases on which he relies. Kraig's involvement in Sturman's operation was "so pervasive that [his] knowledge of its illegal nature was reasonably certain" and Kraig "misrepresented or actively concealed facts" about Sturman's activities.

Ample evidence was submitted at trial from which the jury could have convicted Kraig. The most harmful testimony came from Ginsberg. As to pre-levy conduct, Ginsberg testified that in 1988, well before the tax levy against Sturman, Ginsberg turned to Kraig for "information, advice and help in dealing with Gemstone in general." Ginsberg Tr. at 207, J.A. at 405. Ginsberg testified that Kraig was "the person that knew most of the details about Gemstone. [Kraig] gave me all the information, all the files, and he had been involved in many of the transactions that had come to me in the files.... [H]e was Reuben's attorney and close friend and he could get things done and he could tell me who to deal with and just provide me with information to help me." *Id.* Ginsberg further testified that "[Kraig] had given me outlines of which properties were to be purchased [by Gemstone], how they were to be purchased, where the money was to come from...." Ginsberg Tr., at 216, J.A at 414. In 1989, about the time the levy was assessed, Ginsberg sent a memo to Kraig and others outlining how he planned to transfer different properties into Gemstone's name. Gov't Ex. 30, J.A. at 207.

After the tax levy was assessed, evidence demonstrates that Kraig participated in keeping the IRS from discovering who actually owned Gemstone. Ginsberg testified that at least by March 1989 Kraig knew that Gemstone was actually owned by Sturman and not by a trust. Ginsberg Tr. at 240, J.A at 439. Kraig and Ginsberg then lied to the lawyers they had hired to file a wrongful levy action against the United States on Sturman's behalf when they told the lawyers that a Swiss citizen named Kummer owned the trust and manufactured a false affidavit so stating. Ginsberg Tr. at 235, 253–54, J.A. at 433, 451–52.

Other testimony showed that Kraig was involved in concealing assets from stores Sturman sold. Kraig was involved in drafting the sales contracts to make it look like Eduardo Stockali was the seller. Checks made out to Stockali were sent to Kraig who sent them to Stockali in Switzerland. Stockali then deposited the checks in offshore bank accounts. Kraig sent copies of the checks to Sturman so Sturman could keep track of how much was being deposited in the offshore accounts. Ginsberg Tr. at 265, J.A. at 463; Bordone Tr. at 60–61, J.A. at 250–51.

Other activities between 1985 and 1993 also should have alerted Kraig that his actions on behalf of Sturman were illegal. Sturman's offices were raided by the IRS in 1985 while Kraig was a tenant in the space. Later in 1985, Sturman was indicted in a 16–count conspiracy for tax fraud. Several lawyers and accountants quit representing Sturman and told Kraig why they were leaving and advised him to leave too. The evidence shows that Kraig knew that Sturman owed taxes and conspired to deprive the government of the information it needed to ascertain and collect those taxes, as well as concealing assets.

Therefore, the record indicates that the jury reasonably could have inferred from the evidence that Kraig knew of the conspiracy, willfully joined the conspiracy and participated in fulfilling the objectives of the conspiracy both before and after the assessment of the tax levy against Sturman. Kraig's conviction under the defraud clause of 18 U.S.C. § 371 is supported by adequate evidence.

**B. *Sentencing***

**1. *Kraig's Role in the Offense***

■ The District Court enhanced Kraig's base offense level by three levels for his role as a "manager" in the conspiracy. Kraig challenges this enhancement because he contends that the evidence does not show that he in any way controlled or supervised any of the other coconspirators.

■ U.S.S.G. § 3B1.1(b) provides a three-level enhancement if the defendant is a "manager or supervisor" of criminal activity that involves five or more participants or is otherwise extensive. Contrary to Kraig's assertion, the precedents in our Court hold that the evidence need not show that Kraig was the manager or supervisor of five other persons, but rather that he had a managerial or supervisory role in illegal conduct involving five or more persons. *See, e.g., United States v. Dean,* 969 F.2d 187, 197 (6th Cir.

1992), *cert. denied*, 507 U.S. 1033, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993) (guidelines require five participants, not five subordinates to defendant).

The criminal activity here clearly involved more than five participants. The indictment here names four participants and by including Reuben Sturman, not named in the indictment at issue here but clearly a participant in the conspiracy, the total is at least five. Moreover, there is evidence that many more people were involved in the conspiracy. *See* Memorandum Opinion Regarding Sentencing at 4–5, J.A. at 52–53.

As to Kraig's role in the conspiracy, the evidence supports the finding that he recruited lawyers and accountants to participate in the scheme. He recruited attorney Robert Garfield to consolidate various real estate holdings of Sturman's into one entity that became Gemstone. Kraig contacted the Panamanian law firm that formed Gemstone. The testimony also demonstrates that Kraig provided information about Sturman's various holdings to the numerous accountants and lawyers working for Sturman and it was to Kraig that these persons turned for information regarding Gemstone. Given this ample evidence, it was within the District Court's discretion to enhance Kraig's base offense level by three levels.

### 2. Calculation of Kraig's Base Offense Level

#### a. Which Subsection to Use

▇▇ Kraig's base offense level was established pursuant to U.S.S.G. § 2T1.9, Conspiracy to Impair, Impede or Defeat Tax. Kraig does not contest the correctness of using this guideline, but contends that the wrong subsection of the guideline was used in determining his base offense level. Subsection (a) provides that the greater of (1) the base offense level for section 2T1.1 or section 2T1.3, whichever is applicable depending on the underlying conduct, or (2) base offense level 10 should be applied. Section 2T1.1, Tax Evasion, and section 2T1.3, Fraud and False Statements Under Penalty of Perjury, provide that the base offense level for these crimes is to be determined by applying the tax tables contained in section 2T4.1.

The District Court determined that section 2T1.9(a)(1) applied and therefore looked to section 2T1.1 and section 2T1.3 as directed. The District Court determined that either section 2T1.1 or section 2T1.3 could be applied in this case and because they both use the tax table in the same way, as a practical matter, therefore, it was not necessary to determine which section applied. Both sections 2T1.1 and 2T1.3 direct the user to establish the "tax loss" caused by the conduct and to then look to the tax loss table in section 2T4.1 to determine the base offense level. Kraig contends that because there was no "tax loss" as defined in the sections 2T1.1 and 2T1.3 and his offense is not similar to either of the tax offenses covered by sections 2T1.1 or 2T1.3, the District Court should have defaulted to section 2T1.9(a)(2) and imposed a base offense level of 10.

We do not agree with Kraig's interpretation. The plain language of section 2T1.9 states that the applicable statutory provision is 18 U.S.C. § 371. Application Note 2 provides that the base offense level should come from sections 2T1.1 or 2T1.3, whichever is most applicable, *if* the base offense level is more than 10. As the base offense level applicable here under either section is greater than 10, the plain language of the guideline directs that one of these two sections is to be used. The case law is in agreement. *See, e.g., United States v. Moore*, 997 F.2d 55, 60 (5th Cir.1993); *United States v. Hunt*, 25 F.3d 1092 (D.C.Cir.1994).

#### b. Calculating the Tax Loss

▇▇ Kraig asserts that if this Court determines that the tax loss table under § 2T4.1 does apply to determine his base offense level, the District Court's calculation of the tax loss here was based on improper valuations of the properties involved. Kraig maintains that the tax loss did not exceed $1,500,000 and that the base offense level, therefore, should have been 17. We do not agree. The trial court conservatively estimated the tax loss at between $1,500,000 and $2,500,000 for a base offense level of 18.

▇▇ In assessing the amount of tax loss, the district court is to make a "reasonable

estimate" of the amount of the loss that defendant intended to inflict, not the actual amount of the government's loss. *United States v. Moore*, 997 F.2d at 55. *See also* Sentencing Memorandum at 3, J.A. at 51.

The trial court estimated the value of four properties in arriving at the estimated amount that the conspiracy attempted to conceal from the government to be in excess of $1,500,000 but less than $2,500,000. This is a conservative estimate and is supported by the evidence. The trial court purposely omitted including the value of two properties where it found the amounts more tentative. Sentencing Memorandum Opinion at 4, J.A. at 52. The District Court's loss valuation is not clear error and is affirmed.

### 3. *Downward Departure*

 Kraig also contends that the trial court abused its discretion by failing to grant his request for a downward departure based on the "atypical" nature of the case. Because the sentence imposed by the trial court is within the guideline range, the sentence is not appealable on this basis unless it appears that the trial court was not aware of its discretion to depart downward. The trial court specifically stated that "[t]he Court has considered and rejected the suggestion" that a downward departure is appropriate. Sentencing Memorandum at 6, J.A. at 54. Moreover, the reasons given by Kraig to warrant departure are not that unusual. Kraig focuses mainly on the fact that he is an attorney who was zealously representing his client and was blinded to that client's improper conduct because he believed that the government was "out to get" his client due to the nature of his business.

### 4. *Government's Cross–Appeal*

#### a. *Enhancement for Use of "Sophisticated Means"*

 The sentencing guidelines allow an upward adjustment of two levels for use of "sophisticated means" in a tax evasion case. U.S.S.G. § 2T1.1(b)(2). A determination of whether conduct constitutes "sophisticated means" is a question of fact for the District Courts and is reviewed for clear error. Although the conspiracy at issue here was complex, the sophisticated means enhancement requires the sentencing court to look at the actions taken by the individual. A defendant involved in a complex or repetitive tax conspiracy is not automatically given a sophisticated means enhancement if his or her personal involvement did not constitute sophisticated means.

Kraig did not personally open the Swiss bank accounts or set up the shell corporations—this was the work of the Panamanian law firm. While the evidence demonstrates that Kraig undoubtedly knew of their existence and function in the conspiracy, his personal involvement with them was minimal.

A close question is presented as to Kraig's personal use of sophisticated means. Although we might have reached a different conclusion than the District Court, we must "accept the findings of fact of the district court unless they are clearly erroneous and shall give deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). We would violate this admonition were we to substitute our judgment on this issue.

#### b. *Acceptance of Responsibility*

 U.S.S.G. § 3E1.1 provides for a two-level reduction in the offense level if the defendant clearly demonstrates affirmative acceptance of personal responsibility for his criminal conduct. The trial court granted Kraig's request for a downward adjustment for acceptance of responsibility, made for the first time at the sentencing hearing, after listening to Kraig's statement at the sentencing hearing. The government argues on cross-appeal that granting the request was in error both because it was not timely made and because the facts do not warrant the departure. The government points out that Kraig maintained his innocence, before, during and after trial, and only partially accepted responsibility after his conviction.

 Conviction by trial does not automatically preclude a defendant from consideration for a reduction based on acceptance of responsibility. In certain circumstances a defendant may clearly demonstrate an acceptance of responsibility even though he exer-

**1372**

cises his right to trial. In granting the request, the District Court recognized that it was a "close call" and acknowledged that he had not encountered a case quite like this one before. The District Court seemed to rely primarily on the points that (1) Kraig was a lawyer with an unblemished record up to that point, (2) his conduct resulted from Kraig's zealous advocacy on behalf of Sturman in his adult entertainment business and (3) Kraig believed that the government was "out to get" Sturman any way it could to stop his adult entertainment business.

The standard of review here is whether the finding was clearly erroneous. While we recognize that other sentencing courts may have come to a different conclusion regarding this matter, acceptance of responsibility is uniquely within the province of the District Court and we do not find clear error. U.S.S.G. § 3E1.1, comment. (n. 5); *United States v. Fleener,* 900 F.2d 914, 917 (6th Cir.1990) (grant of reduction for acceptance of responsibility affirmed even though defendant put government to its burden at trial).

Furthermore, we give deference to the sentencing judge in determining acceptance of responsibility, particularly where the sentencing judge also presided over the entire trial, as the judge did here. The District Court was in the best position to gauge Kraig's state of mind and to assess his credibility and this Court will not lightly overturn that finding.

For the foregoing reasons, the judgment of the District Court is affirmed.