RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0300P (6th Cir.)
File Name: 01a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RAYMOND P. HAMILTON,
  *Defendant-Appellant.*

No. 00-6041

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00104—Charles R. Simpson III,
Chief District Judge.

Argued: July 12, 2001

Decided and Filed: August 31, 2001

Before: SILER and GILMAN, Circuit Judges; DONALD,
District Judge.[*]

_____

[*] The Honorable Bernice B. Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

1

------------------

**COUNSEL**

**ARGUED:** Patrick J. Bouldin, WESTERN KENTUCKY FEDERALS OFFICE, Louisville, Kentucky, for Appellant. C. Dean Furman, Jr., ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Scott T. Wendelsdorf, WESTERN KENTUCKY FEDERALS OFFICE, Louisville, Kentucky, for Appellant. C. Dean Furman, Jr., Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee. Raymond P. Hamilton, Manchester, Kentucky, pro se.

------------------

**OPINION**

------------------

RONALD LEE GILMAN, Circuit Judge. Raymond P. Hamilton, a former Louisville, Kentucky police officer, was indicted for (1) conspiracy to commit credit card fraud, (2) extortion, and (3) attempted extortion. After a four-day jury trial, he was convicted on all counts. He was then sentenced by the district court to serve 18 months in prison, spend three years on supervised release, and pay $17,666 in restitution. Hamilton now appeals, challenging his conviction and sentence on various grounds. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

This case revolves around the actions of three individuals. One is Hamilton, who was a Louisville police officer at the time of the events in question. The second is Michael Gordon, a businessman who owned a pawn shop in Louisville and was a personal friend of Hamilton. Finally, Virgil Mozee was a convicted felon who fenced illegally obtained merchandise at Gordon's pawn shop. The government charged that during the time that Mozee was selling illegally

obtained items to Gordon, Hamilton provided a police presence at the pawn shop and assisted Mozee in thwarting earlier felony charges of credit card fraud, all in exchange for receiving pawn shop items at special discounts.

## A. Conspiracy to commit credit card fraud

The charged conspiracy occurred during 1996 and 1997, when Mozee stole credit cards from ladies' purses left in shopping carts. He would then use the cards to purchase computers and other merchandise to sell to Gordon's pawn shop. This merchandise would in turn be resold to other pawn shop customers. On some occasions, Mozee would use a toll-free telephone number provided by Gordon to check on whether the stolen credit cards remained valid before using them. Gordon would then place orders with Mozee so that Mozee could order specific items using the stolen credit cards. When the cards became unusable, Mozee would give them to Gordon, who would turn them over to the issuing bank in exchange for a $50 recovery fee.

The date when Gordon first became aware that Mozee was obtaining merchandise by using stolen credit cards is contested. Mozee claims that Gordon learned of Mozee's scheme sometime between December of 1996 and January of 1997, when Mozee first began selling items to Gordon. Gordon, however, recalls that it was not until "probably around May or June [of 1997]" that Mozee first told him that the merchandise was being bought with stolen credit cards. To support its contention that Gordon knew about the fraud from the time Mozee first began coming to the pawn shop, the government presented evidence that Mozee was never required to fill out a pawn card and be thumbprinted for items he brought to the store, even though the cards and thumbprinting are required by law.

Also contested is the date when Hamilton initially learned of the credit card fraud. Gordon testified that on the first occasion when Hamilton was present during one of Mozee's sales to the pawn shop, Hamilton heard Gordon tell Mozee not to worry about Hamilton's presence and "just to bring the

stuff in." Even though Gordon thought that this occurred around June or July of 1997, Mozee testified that it occurred in late 1996 or early 1997. Mozee also claimed that he saw Hamilton in the store twice a week before April of 1997, and about three times a week thereafter. During those times, Mozee openly talked with Gordon about how he had obtained the merchandise that he was selling by using fraudulent credit cards. Mozee was never arrested by Hamilton, even though Hamilton saw that Mozee was selling items to Gordon without filling out a pawn card and being thumbprinted as required by law.

Finally, Gordon testified that he explicitly told Hamilton about the credit card fraud in September or October of 1997, and that this information did not seem to surprise Hamilton. Gordon also said, however, that he believed Hamilton had no reason to know of the fraud prior to being explicitly informed of its existence. But the government contends that Hamilton's actions indicated he was aware, well before September or October of 1997, that Mozee had engaged in earlier instances of credit card fraud. In particular, the government points out that on April 11, 1997, Hamilton helped reduce three felony charges pending against Mozee for using a fraudulent credit card down to one misdemeanor conviction involving no jail time.

Hamilton had also been personally involved in approximately a hundred transactions with the pawn shop over the course of four or five years. On one occasion, Hamilton loaned Gordon money to operate his business. In addition, during his visits to the pawn shop, Mozee testified that Hamilton purchased various items at deep discounts that Mozee had brought to the pawn shop to sell, including two computers, a leather coat, and a number of Nintendo video games, all items that Hamilton had been informed came from Mozee. Hamilton later sold some of these items to others. On one occasion, Hamilton even told Gordon that he wanted a certain item and, according to Mozee, told Gordon that he should have Mozee obtain a credit card in order to purchase that item.

Hamilton's crimes were committed. We therefore find Hamilton's jurisdictional argument to be meritless.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.

since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). We find no basis to depart from this general rule in the case before us.

Hamilton next argues that he was not read his Miranda rights before giving a statement to the police. But when a defendant has a claim that he was denied his Miranda rights, he "should have raised any objection to this evidence in a pretrial motion to suppress under Rule 12. Appellants' failure to make such a motion constitutes a waiver of any objection." *United States v. DiCarlantonio*, 870 F.2d 1058, 1063 (6th Cir. 1989) (citing Fed. R. Crim. P. 12(f))). Hamilton failed to file a motion to suppress, causing a waiver of his present objections. Moreover, as a police officer himself, Hamilton can hardly claim ignorance of his *Miranda* rights.

Hamilton's final argument is a challenge to the jurisdiction of the federal courts over the charges brought against him. In particular, Hamilton challenges federal jurisdiction on the basis that "Louisville, Kentucky is a location, which is not out of the jurisdiction of the sovereign state of Kentucky; thus it is NOT WITHIN the jurisdiction of the Federal United States." (Emphasis in original.)

This is a frivolous argument that ignores the basic principles of federalism. The fact that Kentucky has sovereignty within its boundaries does not bar the United States from having concurrent jurisdiction to indict and prosecute Hamilton for federal crimes occurring within those same boundaries. "Federal courts have exclusive jurisdiction of offenses against the laws of the United States under 18 U.S.C. § 3231; the permission of the states is not a prerequisite to exercise that jurisdiction." *United States v. Burchett*, No. 93-5734, 1993 WL 473698, at *1 (6th Cir. Nov. 16, 1993) (citing *United States v. Sitton*, 968 F.2d 947, 953 (9th Cir. 1992)). In addition, 28 U.S.C. § 97(b) provides that the jurisdiction of the Western District of Kentucky covers various counties, including Jefferson County, where

By November of 1997, Mozee and Gordon had become suspects in a police investigation into credit card thefts in the Louisville area. The police noticed, while conducting surveillance of the pawn shop, that a marked police car was often parked on the sidewalk in front of the shop. This car was determined to be Hamilton's.

Mozee was arrested for using a stolen credit card in December of 1997. During his questioning, Mozee told the police about his connection with Gordon. He also told the police that he had sold some of his illegally purchased merchandise to a Louisville police officer named "White." Because Hamilton's car had been seen in front of Gordon's pawn shop, the police suspected that "White" was actually Hamilton. Accordingly, the police placed Hamilton's photograph in a photopack with other pictures, and Mozee picked out Hamilton's photograph as "White."

Mozee later agreed to cooperate with the police in exchange for leniency on his own charges. After Mozee agreed to cooperate, the investigators wired him with a recording device and placed the pawn shop under audio and video surveillance. The investigators then gave lawfully obtained merchandise to Mozee so that he could sell the merchandise to Gordon under the guise of having obtained the merchandise illegally. On both December 11 and 12, 1997, Hamilton offered to help Mozee obtain an attorney for his current troubles with the police. The recorded conversations also made references to a computer that Hamilton desired to acquire. Taped telephone calls between Mozee and Hamilton contained additional statements made by Hamilton offering to obtain an attorney for Mozee in exchange for a computer.

Gordon and Hamilton were both arrested on December 17, 1997. The police subsequently searched Hamilton's home with his consent, where they found a computer and a leather coat that had been purchased using a stolen credit card and sold to Gordon's pawn shop by Mozee. Hamilton then gave a recorded statement to the police, admitting "that 90 something percent of the stuff that's in [Gordon's pawn shop]

is probably either stolen or hot merchandise," and that Gordon had told him that his pawn shop sold stolen goods. Several of Hamilton's representations conflicted with other parts of his statement. Hamilton, for example, claimed that he did not "hang with" Mozee and did not know anything about Mozee having been involved with credit card fraud, yet also admitted being told, six months prior to his talk with the police, that Mozee was bringing in "stolen stuff" to sell.

In addition to Hamilton's statement to the police and his taped conversations with Mozee at the pawn shop, the police also recorded other conversations between Mozee and Hamilton that occurred after Mozee's arrest. During these conversations, Hamilton talked about Mozee's arrest, telling Mozee that "[e]ven if it comes down to the day that you got court I will be there . . . . I will have that s--- covered." Mozee asked: "Hey, if I bring you a desktop today, what's up?" In reply, Hamilton said: "Then we even, dog." Hamilton also reminded Mozee of how he had taken care of Mozee in April of 1997, when Mozee had fraudulent credit charges pending against him, saying: "And you see how quick I did it that one time."

One of the recorded conversations also indicates that Hamilton knew about Mozee's use of stolen credit cards, because Mozee talked to Hamilton about the stolen credit cards using street terminology, saying: "Okay, but look, check this out. I got some fresh wax, so I don't wanna keep holding, you know what I mean." "Fresh wax" is a street term for stolen credit cards that have not been reported and can still be used. Later in the conversation, Mozee explicitly linked "wax" to credit cards when he stated: "I've got to go before this wax run . . . before these cards run, you know."

## B.   Extortion and attempted extortion

The alleged act of extortion occurred in April of 1997, after Mozee had been charged with credit card fraud. In December of 1996, a St. Matthews police detective, John Herbst, had arrested Mozee and an accomplice for attempting to purchase merchandise with stolen credit cards. Mozee was charged

This court gives even more deference to the district court's loss calculations. "In challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations." *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994). The calculation of loss for the full duration of the conspiracy — $200,000 — was based on an estimate given by Gordon. Gordon had no incentive to inflate this estimate, because his own sentence as a coconspirator was based on this figure. Hamilton was then sentenced on the basis of a $143,019.80 loss, a figure proportionate to the amount of time that Hamilton was found to have participated in the conspiracy. The district court reached this figure by multiplying the 251 days of Hamilton's involvement by the $569.80 average daily loss. Because this figure is within the realm of permissible computation, and because the district court committed no error in determining when Hamilton joined the conspiracy, we affirm the district court's sentencing determination.

## E.   Hamilton's pro se brief

In addition to the issues discussed above that were raised by Hamilton's counsel, Hamilton filed his own pro se brief. Many of the additional issues he raises are procedurally barred. He claims, for example, that various witnesses testified falsely against him. But this issue, like most of the others that he raises pro se, is unavailable for appellate review because it was not objected to at trial. *See United States v. Chalkias*, 971 F.2d 1206, 1212 (6th Cir. 1992) (explaining that "[u]nder the contemporaneous objection rule, failure to lodge an objection during the trial constitutes a waiver of any objection on appeal, absent plain error"). Because there is no showing that the district court committed any plain error with regard to these issues, we treat such claims as waived.

Hamilton also argues that his trial counsel was either incompetent or in league with the government. However, "[a]s a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal,

incorrectly calculated the amount of loss attributable to him in determining his sentence. Hamilton claims that the district court erred in two ways: first by finding that Hamilton joined the conspiracy on April 11, 1997, and then by calculating the amount of loss using an averaging method that is allegedly not supported by the evidence.

"[I]n the case of a jointly undertaken criminal activity . . . [a defendant is responsible for] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(B). Here, because there was evidence that Hamilton could reasonably foresee the acts of his coconspirators in furtherance of the credit card fraud at least by April 11, 1997, we have no basis to find that the district court committed an error, much less a clear error, in holding Hamilton responsible for the conspiracy as of that date. *See United States v. Moored*, 38 F.3d 1419, 1423 (6th Cir. 1994) (holding that findings of fact from a sentencing hearing are reviewed under a "clearly erroneous" standard).

The district court based its determination on the fact that April 11, 1997 was the date that Hamilton interceded on behalf of Mozee to get Mozee's charges reduced. Using this date for the start of Hamilton's participation was reasonable, given that by interceding on Mozee's behalf, Hamilton helped Mozee remain free to engage in more credit card fraud. We also conclude that the district court had reasonable grounds to determine that Hamilton could foresee Mozee's future acts, because Mozee was brought to court in April of 1997 for using a fraudulent credit card to purchase merchandise, the same acts involved in the conspiracy. Moreover, other evidence, such as Hamilton's recorded conversations and the testimony of Hamilton's coconspirators, supported the charge that, by April of 1997, Hamilton was already aware that Mozee was engaged in an ongoing conspiracy to commit credit card fraud. We therefore conclude that the district court committed no error in finding that Hamilton joined the conspiracy on April 11, 1997.

with three felony counts. At the courthouse on the day of Mozee's April 11, 1997 hearing, Hamilton approached Herbst, who Hamilton knew from when Herbst had worked with the Louisville Police Department. Hamilton asked the officer if he "could give Mr. Mozee a break on his charges." Herbst agreed, and the prosecutor amended the charges against Mozee to a misdemeanor for the fraudulent use of a credit card, for which Mozee received a probated sentence. Mozee's accomplice, in contrast, received three years in prison for the same crimes that Mozee had originally been charged with.

At Hamilton's trial, Mozee testified that he had talked to Hamilton before the April 11, 1997 hearing. Hamilton had told Mozee not to worry, that Hamilton would take care of the charges by talking to the arresting officer about having the charges reduced. Mozee also answered in the affirmative to a question about whether he had had "a conversation with Mr. Hamilton about what he expected to get in return for his assistance." He repaid this debt, Mozee testified, "[w]ith a lap-top computer" that he gave to Hamilton at a deeply discounted price. This computer was eventually found in Hamilton's home following his arrest.

The other extortion-related offense occurred in December of 1997, after Mozee had again been arrested for credit card fraud. Immediately after the arrest, Hamilton met with Mozee in the jail and told Mozee that he would get Mozee a lawyer. Hamilton again wanted a discounted computer in exchange for his assistance. Gordon testified that after Hamilton and Mozee agreed upon how much the computer was to be discounted in exchange for Hamilton's help, Mozee brought the computer to the pawn shop. The day after Hamilton picked up the computer, he was arrested by the Louisville police. Because the computer was in fact provided by the police and Mozee was by then acting as a confidential informant, the charge against Hamilton was only for attempted extortion rather than actual extortion.

**C.  Trial and sentencing**

Hamilton was charged with committing credit card fraud in conjunction with Gordon as an indicted coconspirator and Mozee as an unindicted coconspirator.  He was also charged with extortion in connection with the April 1997 computer acquisition and attempted extortion in connection with the December 1997 computer purchase.  After a four-day trial, the jury found Hamilton guilty on all counts.

During the sentencing phase, the district court accepted the Presentence Investigation Report's recommendation to consolidate the three offenses into a single group for sentencing purposes.  The district court also accepted the Report's calculation that the Sentencing Guidelines' offense level should be set at 13, based on the determination that this was the proper offense level for extortion and attempted extortion.  In addition, the district court, relying on the testimony of Gordon and Mozee, determined that the loss amount was $200,000 for the entire conspiracy, which it found ran from January 1, 1997 until Hamilton and Gordon were arrested on December 18, 1997.  Based on these determinations, the district court calculated the average loss to be $569.80 per day.

Hamilton argued that if he were to be held accountable for participating in the conspiracy at all, he should only be held to have joined the conspiracy starting in September or October of 1997, which was when Gordon explicitly told Hamilton that Mozee was selling illegally obtained merchandise. This was the same date that was recommended by the probation officer in his Presentence Investigation Report.  The government, however, objected to the recommendation, arguing that Hamilton should be held accountable for the entire length of the conspiracy.  After receiving the government's objections, the district court determined that Hamilton joined the conspiracy on April 11, 1997, the date that he assisted Mozee in obtaining a reduced criminal charge.  The district court then arrived at the amount of loss attributable to Hamilton by multiplying the 251 days

Even Hamilton's taped conversations demonstrated that he regarded his intercessions as creating an obligation on the part of Mozee.  In reference to Mozee's December 1997 arrest, Hamilton told Mozee: "You owe more than that m-----f-----. I'll be hooking you up, boy.  I saved your a-- last time, remember?"  *See Blandford*, 33 F.3d at 699 (holding that a reasonably jury could have found that Blandford, a state legislator, was engaging in extortion when he "accepted [three $500 payments] despite being aware that his acceptance would engender certain expectations on the part of the payor").

Moreover, this court has stated that "[w]hat matters is not whether the official has actual de jure power to secure the desired item, but whether the person paying him held, and defendant exploited, a reasonable belief that the state system so operated." *United States v. Bibby*, 752 F.2d 1116, 1127 (6th Cir. 1985) (internal quotation marks omitted).  Mozee testified that he believed that Hamilton could officially intercede on his behalf and get his charges reduced.  Given that Hamilton was a police officer, a reasonable jury could have concluded that it was reasonable for Mozee to believe that "the state system so operated."

As for the second time that Hamilton offered to help Mozee with his arrest, Mozee had even more reason to believe that Hamilton could officially intercede, because by then Hamilton had already successfully helped Mozee in the past. Hamilton also exploited Mozee's belief by requesting, on both occasions, a deeply discounted computer in exchange for his help.   The testimony of Mozee, Hamilton's recorded statements, and the presence of one of the requested computers in Hamilton's home provide sufficient grounds for a reasonable jury to find that Hamilton engaged in extortion and attempted extortion.  Accordingly, we find no error in holding Hamilton accountable on these counts.

**D.  Sentencing**

In addition to challenging the sufficiency of the evidence against him, Hamilton also argues that the district court

an overt act in furtherance of the conspiracy to sell illegally obtained items, because the conspiracy could not have continued had Mozee become incarcerated. Moreover, Hamilton's offer of help in December of 1997 could be viewed as similarly furthering the conspiracy, because Hamilton was offering to aid Mozee in dealing with his December arrest as he had in April. Given all of this evidence, we find the evidence sufficient to hold Hamilton accountable for the conspiracy to commit credit card fraud.

## C.  Extortion and attempted extortion

Hamilton next argues that there was insufficient evidence to support the charges that he extorted or attempted to extort property from Mozee "under the color of official right" in violation of the Hobbs Act. *See* 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property from another, with his consent, induced . . . under color of official right"). He rests his argument on the fact that he "made no promise to take any 'official action' on behalf of Mozee." An explicit quid-pro-quo promise to perform an "official act" is not necessary, however, to show a violation of § 1951. *See United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000) ("The short answer is that under the Hobbs Act, [t]he official and the payor need not state the quid pro quo in express terms . . . . [O]therwise the law's effect could be frustrated by knowing winks and nods.") (brackets and ellipses in original and internal quotation marks omitted).

Rather than requiring an explicit quid-pro-quo promise, the elements of extortion are "satisfied by something short of a formalized and thoroughly articulated contractual arrangement (i.e., merely knowing that the payment was made in return for official acts is enough)." *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994). Here, Hamilton asked another police officer to reduce the charges against Mozee. The charges were reduced and, as Mozee testified, Mozee sold Hamilton a deeply discounted computer in return for Hamilton's help.

of Hamilton's involvement by the $569.80 average daily loss. This resulted in a figure of $143,019.80, which had the effect of increasing the base offense level from 6 to 13 for the conspiracy count. (Hamilton's challenge to this increase is of benefit to him only if we were to reverse his conviction for the grouped offenses of extortion and attempted extortion.)

Utilizing the recommended offense level of 13, the district court determined that the applicable Sentencing Guidelines' range was 12 to 18 months. Hamilton was then sentenced to serve 18 months in prison, spend three years on supervised release, and pay $17,666 in restitution. This appeal followed.

## II.  ANALYSIS

## A.  Standard of review

In reviewing a challenge to the sufficiency of the evidence supporting a jury conviction, the evidence must be viewed in the light most favorable to the prosecution, and the conviction must be sustained if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Challenges to a sentencing determination are reviewed under a different standard. This court will not set aside a district court's findings of fact from a sentencing hearing unless the findings are clearly erroneous. *See United States v. Moored*, 38 F.3d 1419, 1423 (6th Cir. 1994). "Legal conclusions regarding the Guidelines, however, are reviewed de novo." *United States v. Talley*, 164 F.3d 989, 1003 (6th Cir. 1999) (internal citations omitted). Because Hamilton raises independent challenges to the district court's factual findings and legal conclusions, but not the integrated application of one to the other, the Supreme Court's recent holding regarding the standard of review for the application of a Sentencing Guideline to a specific factual situation is not implicated here. *See Buford v. United States*, 121 S. Ct. 1276 (Mar. 20, 2001) (holding that deferential review is appropriate when an appellate court reviews the trial court's

determination as to whether an offender's prior convictions were consolidated, or related, for purposes of the Sentencing Guidelines).

## B.  Conspiracy to commit credit card fraud

This court set forth the following elements of a conspiracy in *United States v. Kraig*, 99 F.3d 1361 (6th Cir. 1996):

> The essential elements of a conspiracy are: (1) the conspiracy described in the indictment was wilfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.

*Id.* at 1368.  In order to show a conspiratorial agreement, only a tacit understanding among the participants is required. *See United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991). "A conspirator need not have personally performed the deed for which he is being held liable.  A conspirator can be held criminally liable for the actions of his co-conspirators committed during and in furtherance of the conspiracy." *Id.*

Hamilton argues that the government failed to present sufficient evidence to support the charge that he engaged in a conspiracy to commit credit card fraud, contending that the only allegations against him were that he was a police officer who purchased from Gordon and Mozee "a computer, computer games, and a leather jacket." He acknowledges that such purchases may have been enough to sustain a conviction for receiving stolen property, but argues "these were clearly wholly independent acts that were not taken as the result of any agreement with Gordon and Mozee to traffic in stolen credit cards and had nothing to do with the specific conspiracy alleged in the indictment."

The evidence in the record, however, indicates that Hamilton's participation was much more extensive than he describes.  To start with, both Mozee and Gordon testified that Hamilton was a member of the conspiracy.  This alone makes Hamilton's contention all but unsustainable. *See United States v. Ward*, 190 F.3d 483, 488 (6th Cir. 1999) (finding the testimony of one cooperating coconspirator sufficient to sustain a conspiracy conviction).  Furthermore, on a number of occasions, Hamilton witnessed Mozee selling items to the pawn shop without filling out a pawn card and being thumbprinted as required by law.  Hamilton also admitted that he purchased at special discounts various items sold by Mozee to the pawn shop, and later resold some of these items to others.

In addition, Mozee testified that, prior to September or October of 1997, he had talked to Gordon about the illegal nature of the merchandise in the presence of Hamilton. Although Hamilton "offered an innocent explanation for the incriminating facts proved by the government, the jury was free to disbelieve [them]." *United States v. Ledezma*, 26 F.3d 636, 641 (6th Cir. 1994).  The testimony of Gordon and Mozee, the admissions of Hamilton himself, and the taped conversations between Mozee and Hamilton all provide more than sufficient proof for a rational trier of fact to conclude that Hamilton was aware of and participated in a conspiracy to commit credit card fraud. *See United States v. Kincaide*, 145 F.3d 771, 781-82 (6th Cir. 1998) (holding that there was sufficient evidence to support a conviction for conspiracy to possess and distribute controlled substances where, among other things, a coconspirator testified about the defendant's activities regarding the conspiracy and wiretap evidence corroborated the defendant's participation).

Furthermore, Hamilton was aware, at least as of April 1997, that Mozee had been charged with similar acquisitions of illegally purchased items, because that is when Hamilton assisted Mozee in obtaining a reduction of three felony charges for fraudulently using a credit card.  Hamilton's aid to Mozee also supported the finding that Hamilton engaged in