RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-3186

LEIF D. ROZIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 05-00139-001—Susan J. Dlott, Chief District Judge.

Argued: October 13, 2011

Decided and Filed: January 6, 2012

Before: ROGERS, COOK, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** H. Louis Sirkin, SIRKIN, KINSLEY & NAZZARINE CO., LPA, Cincinnati, Ohio, for Appellant. Deborah K. Snyder, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** H. Louis Sirkin, Scott Ryan Nazzarine, SIRKIN, KINSLEY & NAZZARINE CO., LPA, Cincinnati, Ohio, for Appellant. Deborah K. Snyder, Frank P. Cihlar, Gregory Victor Davis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge. Taxpayer Rozin, along with others, took business and individual tax deductions for the cost of so-called "Loss of Income" insurance policies, although the insurance aspect of the policies was questionable and the policies allegedly permitted Rozin to get back or maintain control of the premium funds. Rozin was

convicted on three counts of tax-related crimes: subscribing a false tax return under 26 U.S.C. § 7206(1); attempting to evade taxes under 26 U.S.C. § 7201; and conspiracy to defraud the Government under 18 U.S.C. § 371. These convictions must be upheld because the Government presented sufficient evidence of the crimes, because Rozin's evidentiary argument regarding prior bad acts evidence is without merit, and because there is no merit to Rozin's argument that the Government was required by the nature of the charges to forgo charging him under the general crime of conspiracy to defraud the United States. Finally, the district court did not err in ordering Rozin to pay restitution for the personal income taxes of his co-conspirator.

I.

The conspiracy in this case involved the corporate and personal income tax returns filed on behalf of Rozin, Inc. and its co-owners, defendants Leif Rozin and Burton "Buddy" Kallick. Through Rozin, Inc., Rozin and Kallick owned a multi-state retail carpet chain in the 1990s. After two years of negotiations, Rozin and Kallick sold Rozin, Inc. in 2000, resulting in potentially large taxable profits.

In 1998, while Rozin and Kallick were negotiating the sale of Rozin, Inc., their long-time insurance broker, Milt Liss, was introduced to Bruce Cohen, another insurance broker, at a general insurance agents meeting. At the time, Cohen was selling purportedly tax-deductible "Loss of Income" (LOI) insurance policies offered by Caduceus Life Insurance Company, a company licensed in the U.S. Virgin Islands. Liss was unaware of the fact that, at the time that he met Cohen, Cohen's license to sell insurance had been revoked.

To market LOI and "return of premium" ("ROP") insurance products, Cohen gave Liss various promotional materials, including an opinion letter from a law firm stating that premiums for the LOI policies were likely allowable deductions, and a two-page flyer entitled, "Tax Court Settlement on 'Loss of Income' Policy." The flyer described *Savage v. Commissioner*, an alleged settlement between the IRS and a Caduceus LOI policyholder.

The LOI policies insured against loss of income due to certain circumstances, including corporate downsizing, changes in technology, or employee layoffs arising within one year from the date the policy was issued. The policies did not cover the following: death; disability; voluntary termination; self-inflicted injuries; proven criminal acts; negligent or willful misconduct; substance abuse; dishonesty or fraud; insubordination, incompetence, or inefficiency; conflict of interest; or breach of employment contract. Because the policies were allegedly tax deductible, they were especially advantageous for individuals in the highest tax brackets. In 1998, Caduceus also offered ROP riders in conjunction with the LOI insurance policy. If no claim was filed on the policy, the rider would enable the purchaser to receive a significant portion of the premium paid for the LOI policy. If the rider was purchased with the LOI, the LOI premium would be invested for the policy owner and would be distributed to the owner, taxable upon receipt, after ten years or at age sixty-five. If the insured died before the ROP amount became payable, the individual lost his premium. According to the promotional materials, the ROP rider was not tax-deductible, but the LOI premium payments were deductible. However, the promotional materials also included a caveat that if the IRS challenged the deduction, then the individual may owe past taxes due plus interest.

Liss testified that he told Rozin that he had never seen anything like the LOI policy before. During trial, Liss explained that Cohen's LOI policy was different because the ROP rider allowed the policy-holder to "take the money and self-direct it into an investment or do other things." In his experience, Liss did not know of any other policy that allowed the individual to retain control over the funds.

After Liss presented the LOI and ROP policies to Rozin, Liss advised Rozin to have someone look at the materials to assess the policies. Rozin had Alan Koehler, his in-house counsel, analyze the legality of the policies. Rozin also asked Thomas Keehn, a CPA who was the controller for Rozin, Inc., to review the Caduceus Tax Court flyer. After referring to a handbook for accountants, which suggested this type of policy was

deductible, Keehn shared his findings with Koehler. Keehn was never told anything else about the policies.

After Koehler and Keehn conducted their research, Rozin, Kallick, and Koehler met with Cohen to discuss the policies. Cohen assured them that the LOI policies were tax-deductible, and that if they were not, "the worst thing that would happen would be that they would have to pay the additional taxes owed plus interest."

Despite the research conducted by Keehn and Koehler and the meeting with Cohen, Rozin was still concerned about the legitimacy and viability of Caduceus. On October 5, 1998, Rozin, Liss, Koehler, and Cohen traveled to St. Croix in the Virgin Islands to visit Caduceus, meet with its principals, and see the company's banking operations.

Prior to the trip, Liss, Rozin, and Cohen discussed the three options available when purchasing the LOI policy. The first option was to leave the funds with Caduceus, allowing the company to invest the funds until the funds matured after ten years or after Rozin and Kallick reached the age of sixty-five. The second option was to invest the funds in a bank and then apply for a loan from that bank to gain access to a percentage of the premium funds. The third option was to have the ROP funds transferred to Liss, who would invest the money on behalf of Rozin and Kallick in a series of mutual funds. Though Liss would be in charge of the account, the funds were left in Caduceus's name. Rozin and Koehler decided on the third option.

On October 6, 1998, while Rozin was still in the Virgin Islands, Rozin, Inc. purchased two LOI policies and riders, with Rozin and Kallick named as the insured individuals. The premium on each policy was $600,000 and the amount of coverage was $720,000. If Rozin or Kallick qualified for coverage during the one-year policy period, the maximum amount that they could receive under the LOI policy was $30,000 per month for a period of twenty-four months. Rozin paid for the policies with a check totaling $1,275,787.56. On October 7, 1998, $1,037,400 from the check was wired to Liss's corporate account. Both Liss and Koehler earned commissions for their role in the LOI sale.

Instead of leaving the funds in Caduceus's name, Koehler used the money in Liss's account to open two grantor trust accounts—the Revolution Living Trust and the Emperor Living Trust—with Koehler as trustee. By placing the funds in the trust, Caduceus did not have access to the funds. The trusts were revocable by both Rozin and Kallick.

At the end of 1998, negotiations were ongoing for the sale of Rozin, Inc. After Rozin and Kallick entered into an agreement to sell Rozin, Inc. in July 1998, Rozin asked Clark, Schaefer, Hackett & Company, an accounting firm, to advise him regarding possible tax liabilities from the sale. John Parks, a CPA, determined that the tax liability resulting from capital gains could be almost $2,200,000.

Around this time, Liss and Cohen presented Rozin and Kallick with Basis Boost, another product intended to limit the owner's tax liability. Basis Boost was developed by Altheimer & Gray, a Chicago law firm, and acted as a tax shelter that artificially raised a seller's "basis" in his company for tax purposes and then created an artificial loss that would be reported with the gain from the sale, reducing the amount of taxes owed by the seller. At the end of December 1998, Rozin and Kallick gave Liss a check for $625,000. Though Rozin disputes the purpose of the check, Rozin and Kallick allegedly told Liss that if the 1998 sale of Rozin, Inc. went through, the money should be used to purchase Basis Boost. If not, Liss was instructed to buy additional LOI policies.

In early 1999, Rozin asked Keehn to prepare a tax projection including the $625,000 expense, though no one told Keehn what that expense was. Keehn estimated that with the additional $625,000 counted as income rather than as an expense, Rozin and Kallick would each owe approximately $80,000 in additional federal taxes.

In July 1999, Keehn prepared a draft 1998 tax return for Rozin, Inc. During this time, Rozin, Inc. labeled the October LOI payments as "general insurance" in the company's ledger and deducted those expenses in the tax returns. Though the promotional materials explicitly stated that the ROP rider premiums were not tax-deductible, the entire $1,275,787.56 was listed as a general insurance expense and

treated as a tax deduction. The $625,000 given to Liss for either the Basis Boost or LOI policies was also counted as a "professional fee." Prior to filing, Koehler told Keehn to categorize the $625,000 as an insurance expense. At trial, the Government presented two balance sheets that showed that Keehn debited $625,000 from the professional fees account and credited it to the general insurance account. Keehn also changed the federal income tax return, moving $595,000 from the professional fees category to insurance. Keehn left $30,000 in the professional fees category to account for the $30,000 commission.

When the sale of Rozin, Inc. negotiated in 1998 did not go through, Rozin and Kallick instructed Liss to use the $625,000 to purchase additional LOI policies during late July or early August 1999. Four policies, one each for John Downer, then President of Rozin, Inc., Koehler, Rozin, and Kallick, were purchased. The policies were backdated to December 1998 so that Rozin, Inc. could claim them as deductions for the 1998 tax year. Cohen, Liss, Rozin, Kallick, and Koehler split a $30,000 commission as a result of the sale.

At the time Rozin and the others purchased the August 1999 LOI policies, Caduceus had substituted the ROP riders with a new plan that allowed the premium funds to be placed in grantor trusts established by Rozin and Kallick and then invested in reinsurance companies in Nevis, an island in the Caribbean Sea. Under this scheme, if no claim was made on the LOI policies Rozin and Kallick would be able to access the funds after twelve months.

After the four August 1999 LOI policies were purchased, $475,000 was wired to Liss, who then deposited the money in the Revolution Living Trust and Emperor Living Trust. Reinsurance companies were created, and after the LOI policies expired Liss was supposed to invest the premium funds in those companies.

In December 1999, Rozin, Koehler, and Kallick purchased two more LOI policies, for a total of eight policies; these two additional policies were backdated to July 1999. Rozin, Inc. paid almost $1,600,000 in premiums for these policies.

Though the timing is unclear from the record, Rozin also spoke with friends, Dr. Christopher Lawley and Richard Sparnell, about buying LOI policies and the Basis Boost product. Rozin, Lawley, and Sparnell belonged to the same golf club. At Rozin's urging, Lawley bought a LOI policy, and Sparnell bought the Basis Boost product.

In early 2000, the insurance commission in the Virgin Islands audited Caduceus. Caduceus told Cohen that the initial funds that had been returned to Liss should have remained in Caduceus's name, rather than being placed in the trusts. Caduceus asked that the funds be placed under its name, or else Caduceus would be forced to unwind the transactions; however, even under Caduceus's name, Liss would still exercise responsibility for the investment. In August 2000, Liss was instructed by Rozin and Kallick to liquidate the funds and wire the money to an account set up for Caduceus at a bank in Michigan. Afterwards, Caduceus was to wire the funds back to Liss, who would then invest the funds in one of the reinsurance companies established by Rozin and Kallick. However, during this time, the IRS began investigating Rozin, Inc. for fraud. Liss turned over all information regarding the LOI policies to Martin Horwitz, an attorney hired by Rozin. Liss testified that Horwitz told him that Rozin and Kallick had made a claim under the LOI policies and that part of the liquidated funds would be used to pay the $1,400,000 claim, while the remaining amount was to be invested in the reinsurance company.

Shortly before this, in June or July of 2000, Keehn prepared a corporate tax return for 1999, including a tax deduction for the LOI policies bought in December 1999. However, due to the IRS investigation, the 1999 return was never filed with the IRS; instead, Keehn gave it to Horwitz.

In 2005, a federal grand jury returned an indictment charging Rozin and co-defendants Kallick, Koehler, Liss, and Cohen with conspiracy to defraud the Government under 18 U.S.C. § 371 (Count One). Rozin was also charged with one count of subscribing a false tax return, in violation of 26 U.S.C. § 7206(1) (Count Two), and one count of attempted tax evasion, in violation of 26 U.S.C. § 7201 (Count Six).

Rozin moved to dismiss Count One on the ground that the Government was precluded from charging Rozin under the general crime of conspiracy to defraud the United States, where a more specific offense was available to be charged; Rozin relied in this regard on our decision in *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989). The district court denied the motion, distinguishing *Minarik* and relying on *United States v. Damra*, 621 F.3d 474, 507 (6th Cir. 2010).

Rozin, Koehler, and Kallick pled not guilty, but Kallick passed away prior to trial and charges against him were dismissed. Cohen and Liss entered guilty pleas. Rozin and Koehler were tried, and their trial took thirteen days. Liss was one of the Government's key witnesses; his testimony comprised nearly five days of the trial. The jury convicted both Rozin and Koehler; Rozin was convicted of all three counts.

The district court subsequently denied Rozin's properly presented motion for judgment of acquittal. In doing so, the district court held that, examining the evidence in the light most favorable to the Government, the Government provided sufficient evidence that Rozin willfully subscribed to a false tax return and willfully attempted to evade taxes. The district court relied on (1) the lack of a "true business purpose for purchasing the various LOI policies," (2) the "dubious nature" of the policies, including the high premium to coverage ratio, as well as the practice of backdating, (3) Rozin's access to and control over the funds, (4) Rozin's descriptions of the policies to Sparnell and Lawley as "tax-savings product[s]," and (5) the differences between the policies Rozin bought and those that were advertised in Cohen's promotional materials. In addition, the district court held that Rozin did not have a good faith reliance defense because he withheld relevant information and had reason to suspect the motives of the individuals on whom he supposedly relied. The district court also determined that "for the same reasons [discussed above regarding willfully subscribing a false tax return and evading taxes] . . . there [was] sufficient evidence that Rozin knew of and intended to join in a conspiracy to defraud the IRS."

Rozin was sentenced to one year and one day in prison, followed by three years of supervised release, 2,000 hours of community service, a $30,000 fine, and $775,294

in restitution. On Rozin's timely appeal, he challenges the denial of the motion to acquit. He also argues that the district court improperly admitted evidence of prior bad acts under Fed. R. Evid. 404(b), that the Government improperly charged Rozin under the defraud prong of 18 U.S.C. §371, and that the district court erred by ordering Rozin to pay Kallick's personal income taxes as restitution. None of these arguments warrants reversal.

II.

## A.  Subscribing to a false tax return and attempting to evade taxes

The Government presented sufficient evidence of Rozin's willful intent to subscribe a false tax return and attempt to evade taxes. In considering insufficiency of evidence claims following a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In evaluating the evidence, "[t]he government must be given the benefit of all inferences which can reasonably drawn from the evidence, even if the evidence is circumstantial." *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir. 1984) (citations omitted).

Contrary to Rozin's argument, the Government presented sufficient evidence for a rational trier of fact to find that Rozin acted willfully when he subscribed a false tax return and attempted to evade paying taxes. Acting willfully in this context means that Rozin undertook the "voluntary, intentional violation of a known duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Willful intent is an element of both subscribing false tax returns and attempted tax evasion. In relevant part, 26 U.S.C. § 7206(1) states that an individual who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" shall be guilty of subscribing false tax returns. Similarly, 26 U.S.C. § 7201 states that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony[.]"

The Government provided sufficient evidence of willfulness under these provisions, notwithstanding Rozin's argument that there was not sufficient evidence that he knew the corporate and personal tax form documents were false at the time that he signed them. In rejecting this argument, the district court properly examined the evidence in the light most favorable to the Government. The district court recognized the suspicious or "dubious nature" of the LOI policies. Though peddled as "insurance," Liss admitted during testimony that the covered risks—corporate downsizing, employee layoffs, and technological obsolescence—were unlikely to happen to Rozin because he was an owner of a carpet company. Many of the most obvious causes of loss of income, such as death, disability, voluntary termination, and breach of contract, were not covered, and Rozin, Inc. was not under any immediate threat of bankruptcy. In addition, unlike other legitimate insurance policies, Rozin maintained control of the funds; when pitching the LOI policies to potential buyers, Rozin described them as "a way to lower your taxes" while also receiving "a large percentage of that money back." Finally, the district court described the high premium-to-coverage ratio as suspect, suggesting improper motives on the part of Rozin. Willfulness may be established by evidence that is "entirely circumstantial." *United States v. Fawaz*, 881 F.2d 259, 265 (6th Cir. 1989) (citing *United States v. Grumka*, 728 F.2d 794, 797 (6th Cir. 1984) (per curiam)).

The district court also properly concluded that backdating the LOI policies showed willfulness, because there was no reason for such backdating other than to claim the improper tax deductions. The district court regarded the practice as highly suspicious, noting at sentencing that "[a]t some point in time, [Rozin] should have known something was wrong. Probably when there was the backdating." According to the testimony of Steve Rowe, an IRS Revenue Agent called by the Government, "[a]ny evidence of backdating results in a badge of fraud, meaning the IRS would question the validity of the policy itself and the deduction." Though the district court did not elaborate, the court found "ample evidence" that the policies were backdated and that Rozin was instrumental in this decision. Liss testified that Rozin knew that the policies were going to be backdated and that as a result he would receive "no economic benefit for that period of time." Backdating served no legitimate business purpose; when the

policies were purchased in August 1999, but backdated to December 1998, only five months were left on the policy coverage and Rozin had triple coverage during this time. Though Rozin argues that businesses will backdate policies for a "myriad of legitimate reasons," he provides no viable rationale for his actions. Instead, Rozin refers to the testimony of Mary Blanton, the former administrative assistant of Cohen Insurance, to support his claim. However, none of the reasons mentioned in her testimony is applicable to this case. Rozin's backdating and moving up the policy date permitted Rozin to have access to his funds even earlier than otherwise, and thus reflected improper motivation on his part.

Though Rozin maintains that he considered the LOI policies to be a tax-deferred IRA-type benefit plan, the record shows that he knew that he would have immediate access to the funds because they were placed in revocable trusts. This further undermines Rozin's assertion that he did not know that the tax deductions were improper. When selling the LOI policies to friends, Rozin stated outright that about eighty-five percent of the money would "come back and be held in a trust" that the individual would "have control over." Evidence that Rozin knew that he would have access to most of his money, while reaping the benefits of a large tax deduction, would permit a rational trier of fact to find that he willfully utilized the LOI policies in order to evade taxes. This conclusion is bolstered by the fact that none of the policies described in Cohen's promotional materials allowed individuals to retain control over their funds.

Rozin argues that because he relied on the *Savage* opinion, three legal opinion letters, and other promotional materials provided by Cohen, he should not be found to have acted willfully. However, the materials relied upon by Rozin did not discuss reinsurance schemes and none of the policies described in Cohen's promotional materials allowed individuals to retain control over their funds. In the *Savage* opinion, the IRS had specifically "ensure[d] that Mr. Savage had not received his funds back under the refund of premium clause." All of the opinions also state that a legitimate business purpose is needed to legally claim a tax deduction. As the record shows that

the LOI policies were not legitimate insurance purchases, this undermines Rozin's claim that he did not know there was anything wrong with the deduction.

Rozin also argues that due to his reasonable reliance on the advice of others, the Government was unable to negate his good faith belief that the tax returns were correct. It is true that a defendant who "ha[d] a good faith belief that he was not violating tax law . . . cannot be found guilty of a tax violation, even if the good faith belief [wa]s unreasonable[.]" *United States v. Abboud*, 438 F.3d 554, 581 (6th Cir. 2006). This argument is however not supported by the record in this case. The elements of a "reliance defense" include: "(1) full disclosure of all pertinent facts, and (2) good faith reliance on the accountant's advice." *United States v. Duncan*, 850 F.2d 1104, 1116 (6th Cir. 1988), *abrogated on other grounds*, *Schad v. Arizona*, 501 U.S. 624 (1991); *United States v. Bugai*, No. 97-1280, 1998 WL 553168 at *3 (6th Cir. Aug. 21, 1998) (per curiam). Because Rozin either did not provide full information to those he supposedly relied upon, or he had reason to believe that the advice provided by these individuals was incorrect, the district court correctly held that Rozin could not mount a credible good faith reliance defense. Viewed in the light most favorable to the Government, the record supports a finding by a rational trier of fact that Rozin did not rely in good faith on the advice of Keehn, Liss, Cohen, or Koehler.

Because Keehn was not aware of the full facts regarding the LOI policies, Rozin cannot claim that he relied on Keehn's advice in good faith. As we explained in *United States v. Garavaglia*, 566 F.2d 1056, 1060 (6th Cir. 1977), a defendant who relies on others to prepare his tax returns "may not withhold information from those persons relative to taxable events and then escape responsibility for the false returns which result." During his testimony, Keehn admitted that he is not a tax specialist, and that he never discussed the LOI policies with Rozin. In addition, Keehn was never told about the reinsurance schemes or the trusts, and thus could not have provided an adequate assessment of the legality of the product. Keehn never attended a meeting about the scheme and never examined the LOI policy. As Keehn was not fully informed, Rozin's claim that he relied on Keehn in good faith does not negate willfullness.

Similarly, Rozin cannot claim good faith reliance on the advice of Liss. In his testimony, Liss clearly stated that his role was not to provide Rozin with tax advice. In addition, because Liss received commissions from the sale of LOI policies, his motives were questionable. Finally, and most importantly, Liss expressed doubt from the outset and told Rozin that "I don't know anything about this. I've never heard of this kind of coverage." Therefore, Rozin should have realized that it would be unwise to rely on Liss, and a rational trier of fact could have found that any such reliance would not have been in good faith.

The record also suggests that Rozin did not rely on Cohen, let alone rely on Cohen in good faith. There is evidence that Rozin did not trust Cohen; for instance, despite Cohen's assurances, Rozin was concerned that the company, Caduceus, might not even exist. Cohen also told Rozin that if the IRS did "challenge the deduction," the worst thing that Rozin would have to do would be to pay the taxes owed plus interest. Noting the possibility that the IRS could challenge the deduction should have raised a red flag for Rozin, giving him reason to suspect that the information Cohen provided him was incorrect. In addition, as with Liss, Cohen's motivations were at least suspect because he received commissions from the sale of the LOI policies.

Though the district court admitted that Rozin's relationship with Koehler, his in-house counsel, was a closer call, the evidence supports a finding by a rational trier of fact that Rozin did not rely on Koehler in good faith. Like the others, Koehler received a commission from the sale of the LOI policies. There is also evidence that Koehler and Rozin were part of a scheme to sell illegal tax products, similar to the LOI policies. Finally, the district court noted that Koehler, as Rozin's employee, was "dependent" on Rozin. Accordingly, the district court correctly found that there was enough evidence for a rational juror to determine that Rozin did not rely on Koehler in good faith.

There is also no merit to Rozin's argument that the Government "conce[ded]" that "purchasing and deducting the LOI policies on the advice of qualified professionals does not constitute willful tax evasion or the willful filing of a false tax return" because others who purchased the policies were not prosecuted. First, it is not possible to tell

from the record whether the individuals mentioned by Rozin—Lawley, Sparnell, and Cohen's daughter—could have legitimately claimed good faith reliance. Just because Rozin was not able to meet the standard for a good faith defense does not mean that others might not meet it. Second, the facts undermine Rozin's allegations. For instance, Rozin claims that Lawley, an individual to whom Rozin marketed the LOI policies, bought the policies but was never prosecuted. However, Lawley never claimed a deduction on his 1999 tax return, and thus did not partake in an illegal activity. Though Rozin tries to argue that he also did not claim a tax deduction on his 1999 tax return, Count Two and Count Six of the Indictment were for the deductions taken during the 1998 calendar year. Rozin's situation was not analogous to Lawley's.

Beyond his good faith reliance defense, Rozin provides virtually no other evidence that he was operating under a misunderstanding of the law or that he made a mistake. Rozin points to two comments made by the district court during sentencing, but neither provides much support for his argument that the district court believed that Rozin made a "mistake" that would negate willfulness. While the district court did state that Rozin was "a good pe[rson] who just made very, very bad mistakes," this comment was likely in reference to Rozin's alleged decision to partake in an illegal activity. Similarly, the statement that Rozin is "a good person who just made a very bad decision," cannot be read as a dispositive finding that Rozin made a mistake; rather, the use of the word "decision" indicates a level of knowledge and willingness on the part of Rozin. These comments do not constitute a finding of lack of willfulness under 26 U.S.C. §§ 7206(1) and 7201.

The Government accordingly provided sufficient evidence that Rozin willfully subscribed to a false tax return and willfully attempted to evade taxes, and Rozin is unable to mount a credible good faith reliance defense.

**B. Conspiracy to defraud the Government**

When viewed in the light most favorable to the Government, a rational trier of fact could also have found that Rozin willfully participated in a conspiracy to defraud the Government under 18 U.S.C. § 371. Rozin's argument that he was a victim rather than a member of Cohen and Liss's conspiracy is not supported by the record. Rozin and Kallick received the greatest benefit from the purchase of the LOI policies and ROP riders, and Rozin admits that the activity that he participated in was an illegal conspiracy and "[i]n retrospect, [he] should not have purchased the policies nor signed and filed the tax returns as they were presented to him." Once the Government establishes that there is a conspiracy, "only slight evidence is necessary to connect a defendant with the conspiracy." *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989); *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir. 1988). The Government is only required to prove that the defendant "knew the object of the conspiracy and voluntarily associated himself with it to further its objectives." *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) (internal quotation marks omitted). In this instance, Rozin admitted that there was a conspiracy, that he should not have participated in it, and that he voluntarily signed and filed illegal tax returns.

The Government provided enough evidence for a rational trier of fact to find that Rozin knew of and willingly participated in the conspiracy to defraud the Government. On this matter, both Rozin and the Government rely heavily on the arguments that they made under the previous willfulness analysis. Rozin again argues that he thought he was buying a "super IRA," which would have been lost if he had died within ten years, and thus he did not knowingly participate in the conspiracy to defraud the Government. However, as discussed under II.A, the Government provided sufficient evidence that Rozin knew that he could exercise control over the funds, and he marketed the LOI policies on this basis. Similarly, Rozin reprises his good faith reliance defense to maintain that he could not be a participant in the conspiracy; however, the evidence shows that Rozin chose to participate in the purchase and backdating of the LOI policies

of his own accord.  As Liss testified, "Nobody ever pushed [Rozin] to do anything. . . .
He made his own decisions."

Rozin's argument that he did not recognize the criminality of his activities, and
thus could not have willfully engaged in the conspiracy, is similarly unconvincing.
Based on Rozin's actions discussed under II.A, including the purchase of LOI policies
that had no legitimate insurance purpose, backdating those policies, and setting up a
reinsurance scheme to access his funds more easily, a rational juror could have found
that Rozin both knew of and willingly participated in the conspiracy.

Rozin also asserts that he was not a conspirator because on his tax returns he
listed all expenses related to the LOI policies as well as commissions from the sales.
However, this argument does not help Rozin because whether or not Rozin listed some
smaller expenses on his tax returns is unrelated to whether or not he improperly claimed
the larger tax deductions.

Because a rational juror could have found that Rozin willfully participated in the
conspiracy to defraud the IRS, on the basis of many of the same facts discussed under
II.A, the district court correctly found that the Government provided sufficient evidence
to uphold the jury's guilty verdict on the conspiracy count.

## C.  Evidence issues

Though Rozin objects to the trial court's admission of a wide range of
evidence—including events related to the Basis Boost purchases, "nearly everything
about Rozin's 1999 taxes," the commissions received by Rozin, the testimonies of
Sparnell and Lawley, the return of the settlement money from Caduceus, and "essentially
all activities that occurred after the filing of the 1998 tax return,"—the trial court
properly admitted all of these facts as evidence of the crimes charged.  Because Rozin
did not object at trial, we review the majority of these claims only for plain error.  *United
States v. Treadway*, 328 F.3d 878, 883 (6th Cir. 2003) (stating standard).  However, to
the extent that the disputed evidence was raised by Rozin in a motion in limine, and the
motion was explicitly decided by the district court, Rozin preserved his appeal.  *United*

*States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). Where Rozin preserved his appeal, we review the district court's decision for abuse of discretion. *United States v. Finnell*, No. 07-5258, 2008 WL 1976609, at *4 (6th Cir. May 5, 2008). Because the district court only explicitly ruled on one relevant motion in limine, application of the abuse of discretion standard is limited to the testimony presented by co-defendant Koehler. However, it is unnecessary to parse the disputed evidence, as all of Rozin's claims fail under both the plain error and the abuse of discretion standards of review.

Though Rozin claims that the district court erred by admitting "prior bad acts," this argument fails because the contested evidence was not within the scope of Fed. R. Evid. 404(b). Rule 404(b) does not apply when "the challenged evidence is 'inextricably intertwined' with evidence of the crime charged," *United States v. Everett*, 270 F.3d 986, 992 (6th Cir. 2001), or when the acts are "intrinsic," or "part of a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Because the disputed evidence directly addressed charges in the indictment and elements of the crimes with which Rozin was found guilty, Rule 404(b) does not apply and thus the district court correctly found that the evidence was admissible.

Rozin mischaracterizes this case as a "one-year, one-item case," and then argues that all of the evidence regarding activities that occurred after the filing of the 1998 tax return should have been excluded. However, because the indictment alleged an extensive conspiracy, including events that occurred in 1999 and 2000, this evidence was central to proving Rozin's role and thus was properly admitted. Activities after the filing of the 1998 tax return that were pertinent to proving the conspiracy included, among other things, purchasing LOI policies in December 1999 and then backdating them to 1998, establishing the reinsurance schemes in 1999 and 2000, and preparing and signing tax return forms for 1999 that reported $1.7 million spent on fraudulent LOI policies.

Rozin also claims that the 1999 tax return was never filed with the IRS, and therefore should not be admitted. This argument is unpersuasive. As the Government points out, Rozin, Inc. was visited by IRS criminal investigators in August 2000, prior to the filing of the 1999 return. Therefore, the decision not to file a 1999 tax return

claiming the LOI deductions, though one such form had already been prepared, was likely the result of the IRS investigation and is probative of the ongoing conspiracy. Rozin also mischaracterizes the district court's decision to exclude testimony discussing how much Rozin would have saved if the 1999 tax return had been filed. Rozin alleges that this proves that "all evidence regarding [the 1999] tax return was irrelevant and speculative." However, the district court admitted other information surrounding the preparation and signing of the 1999 tax return as evidence of the continuing conspiracy, and the "speculative" nature was limited to the testimony of one witness on this narrow question.

The decision to admit evidence of the Basis Boost product was also not plain error or an abuse of discretion. Rozin argues that because he reported all commissions from the sale of Basis Boost on his tax returns, evidence related to these sales was not part of the conspiracy charge. However, the indictment describes the sale of these products as a scheme to "make it appear that the LOI policies . . . were legitimate insurance policies." Because these sales were part of the continuing pattern of illegal activity alleged by the Government, evidence regarding these transactions was admissible as not within the scope of Rule 404(b). In addition, the Government had the right to argue that Rozin intended to purchase Basis Boost but then bought four LOI policies instead, as evidence of backdating. Because the backdating supported a finding of Rozin's willfulness, as discussed in II.A, it was not an error for the district court to admit this evidence.

Finally, as discussed under II.A, the testimony of Lawley and Sparnell was also properly admitted as evidence of Rozin's intent to subscribe false tax returns and evade paying taxes. Rozin's conversations with both witnesses indicated that he marketed the LOI policies as a tax-saving device and knew that the policies allowed the holder to retain access to their funds. As this evidence goes directly to Rozin's understanding of the fraudulent nature of the products, and thus the "willful" element of both 26 U.S.C. §§ 7206(1) and 7201, this evidence was admissible.

However, even if Rule 404(b) should have been applied as Rozin contests, the evidence of "other bad acts" would still have been admissible because this evidence was relevant, used for a proper purpose, and not "substantially more unfairly prejudicial than probative," under Fed. R. Evid. 403. *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007). For the reasons discussed above, the evidence Rozin disputes was highly relevant to this case and probative of Rozin's intent. Rozin also makes no substantive argument that he was unfairly prejudiced as a result of its admission. Though indicative of the ongoing conspiracy, much of the disputed evidence was also incidental to the improper filing of the 1998 tax return. Thus it is unlikely that the jury was unfairly swayed or that it convicted Rozin on the basis of the contested evidence alone, as he claims. *See United States v. Henderson*, 626 F.2d 326, 339 (6th Cir. 2010).

## D.  General charge of "conspiracy to defraud the United States"

The Government could properly charge Rozin with "conspiracy to defraud the United States," under 18 U.S.C. § 371 despite Rozin's argument that such a charge could not be made if conspiracy to commit a more specific crime was available to the Government. Section 371 criminalizes two categories of conduct: (1) conspiracies to commit *offenses* specifically defined elsewhere in the federal criminal code, and (2) conspiracies to *defraud* the United States. Rozin argues that because a single underlying offense, 26 U.S.C. § 7206(2), existed, he should have been charged under conspiracy to commit this offense instead of the more general "conspiracy to defraud" prong. The argument relies entirely on our holding in *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989). The holding of *Minarik*, however, was quite limited:

> where the duties of a citizen are as technical and difficult to discern as they are when a taxpayer, before levy, engages in otherwise legitimate activities that may make ultimate collection more difficult, we hold that a Congressional statute closely defining those duties takes a conspiracy to avoid them out of the defraud clause and places it in the offense clause.

*Id.* at 1196. *Minarik* involved the defendant's structuring of home sale receipts in amounts less than $10,000 so as to avoid bank reports of cash transactions and thereby

make it harder for the IRS to find and levy upon funds already owed to the Government. The fraud alleged in this case, in contrast, involves efforts to reduce taxes reported and paid to the Government.

In upholding the continued viability of the crime of conspiracy to defraud the United States, we have repeatedly recognized that our court in *Minarik* "inten[ded] to limit its holding to the particular facts of that case." *United States v. Mohney*, 949 F.2d 899, 902 (6th Cir. 1991). Unless narrowly limited, *Minarik* would have amounted to a sharp change in the law theretofore allowing prosecution under the defraud clause despite the availability of a separate applicable substantive offense. *Id.* at 902-03. As we have subsequently explained, *Minarik* only applies "when the defendant receives no specific notice of the crimes charged, the violation was too isolated to comprise a conspiracy to defraud, and the taxpayer's duties are technical[.]" *Damra*, 621 F.3d at 507.

First, unlike in *Minarik*, Rozin was adequately informed of the charges against him. In *Minarik*, "there was a great deal of confusion" due to "the Government's shifting theories" and "failure to clearly define the intent element in the indictment." *United States v. Khalife*, 106 F.3d 1300, 1304 (6th Cir. 1997). That was not the case here. In this case, the indictment painstakingly detailed the conspiracy charge against Rozin, and like in *Mohney*, 949 F.2d at 904, outlined the conspiracy's objective, manner and means, and the overt actions taken by the conspirators. The Government has also consistently maintained its theory of the case that Rozin was involved in a widespread and ongoing conspiracy to evade taxes and defraud the Government.

Second, the broad nature of the conspiracy with which Rozin was charged distinguishes this case from *Minarik*. *United States v. Kraig*, 99 F.3d 1361, 1367 (6th Cir. 1996). In *Minarik*, the conspiracy was limited to a single event—the sale of a house—and focused on the "concealment of assets upon which the IRS was empowered to levy." *Id.* Here, as in *Kraig*, in which we upheld a conviction under the "defraud" prong of § 371, the conspiracy involved the defendant's "ongoing involvement in sham transactions over a number of years." *Id.* at 1368.

Third, Rozin's duties were not as "technical and difficult to discern" as in *Minarik*, and thus does not warrant the specific notice provided by a singular offense charge. *See Khalife*, 106 F.3d at 1304. Unlike the defendant's duties in *Minarik*, which included "disclosure requirements pre- and post-levy," *Mohney*, 949 F.2d at 905, this court has held that the duty "to file tax returns and not file false returns [is] not 'technical and difficult to discern.'" *Khalife*, 106 F.3d at 1305.

Our limited holding in *Minarik* does not require the reversal of the conspiracy count in this case.

**E.   The restitution award determined by the district court was proper**

Finally, Rozin argues that he should not be ordered to pay restitution for co-defendant Kallick's personal income taxes of $384,647 because: (1) there was insufficient evidence that Rozin conspired with Kallick to defraud the Government, (2) there was insufficient evidence that Kallick's tax returns were not proper or not paid, and (3) it violates Rozin's due process rights to pay another's taxes when that money could be taken from the person's estate. Because Rozin did not object to the restitution order at sentencing, we review these claims only for plain error. *United States v. Sosebee*, 419 F.3d 451, 457 (6th Cir. 2005) (quoting *United States v. Hall*, 71 F.3d 569, 573 (6th Cir. 1995)).

Rozin argues that because Kallick passed away prior to the start of trial, there was insufficient evidence that Rozin participated in a conspiracy with Kallick under 18 U.S.C. § 371. However, this argument fails because under federal conspiracy law, "even . . . 'if charges are dismissed against all other coconspirators,'" the remaining coconspirator can still be convicted. *United States v. Kennedy*, No. 06-3029, 2007 WL 869259, at *2 (6th Cir. March 21, 2007) (quoting *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986)). This is because a dismissal is not the same as an acquittal. *United States v. Suggs*, No. 93-5357, 1994 WL 6811, at *6 (6th Cir. Jan. 10, 1994). Thus, even though the charges were dismissed against Kallick prior to trial, this does not mean that Rozin could not be found guilty of conspiracy. As discussed above in II.B, there was sufficient evidence for a rational trier of fact to find that Rozin willingly participated in

a conspiracy to defraud the Government.  Once Rozin was found guilty of conspiracy, under 18 U.S.C. § 3664(h), the district court may make each defendant liable for payment of the full amount of restitution when multiple defendants contributed to a victim's loss.  *United States v. Williams*, 612 F.3d 500, 510 (6th Cir. 2010).  Therefore, upon finding Rozin guilty of conspiracy under Count One, the district court could hold Rozin jointly and severally liable for the entire restitution amount, including Kallick's income taxes.

In addition, the Government provided ample evidence to prove that Rozin could reasonably foresee that Kallick, Rozin's partner and co-owner of Rozin, Inc., would claim his share of the fraudulent LOI policy premium deductions on his tax returns.  Once a defendant has been convicted of conspiracy, that individual is liable not only for his own acts, but also for "the reasonably foreseeable acts of his co-conspirators." *United States v. Bogart*, 576 F.3d 565, 576 (6th Cir. 2009) (quoting *United States v. Collins*, 209 F.3d 1, 4 (1st Cir. 1999)).  Because Rozin and Kallick jointly decided to purchase the LOI policies, established trusts in their names, and agreed to the offshore reinsurance scheme, we cannot gainsay under plain error review that Rozin should have known that Kallick would also benefit from the conspiracy.

Lastly, Rozin's argument that there is insufficient evidence that Kallick's taxes have not been paid does not affect his substantial rights under plain error review. Restitution statutes "do not permit victims to obtain multiple recoveries for the same loss." *United States v. McDaniel*, 398 F.3d 540, 555 (6th Cir. 2005).  Therefore, to the extent that any of Kallick's taxes have already been paid, the IRS will not be able to collect and Rozin will not be held liable for them.

III.

The judgment of the district court is affirmed.