**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0578n.06

Nos. 12-5958/13-6092

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Jul 31, 2014*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| MICHAEL LEMAN, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:**    **KEITH, CLAY, and McKEAGUE, Circuit Judges.**

**PER CURIAM.**   Defendant Michael Leman appeals his conviction for conspiracy to distribute oxycodone and methadone, in violation of 21 U.S.C. § 846; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and the district court's order of restitution. After the jury convicted Leman on both counts, the district court sentenced Leman to 180 months of imprisonment and ordered him to pay $1,000,000 in "community restitution." We **AFFIRM** the conviction and restitution award.

**I.**

Between 2000 and 2007, Leman opened pain management clinics, known as "Urgent Care" clinics, in several states. Urgent Care Services, Inc. ("Urgent Care") was the parent company of each of the separately incorporated clinics. The clinics were operated mostly as a cash business, and funds from each clinic were funneled into the parent company's main account each week.

In December 2004, Leman hired a former business associate, Stephen Lyon, to run the "business side" of the clinics. Lyon reported patient numbers and revenue generated by each clinic to Leman daily. Leman also met weekly with Lyon, his accountants, and sometimes other management staff, to go over financial information for each of his business entities.

### A. Philadelphia Clinic

In March 2005, Leman opened an Urgent Care clinic in Philadelphia. Leman hired Dr. Claxton Crowder to work at the clinic. A week or two after the clinic opened, Leman sent Tonia Snook, the receptionist at the Urgent Care location in Slidell, Louisiana, to Philadelphia. Snook worked at the Philadelphia clinic from April 2005 until early July 2005, when she was replaced by Destiny Smallwood.

Patients from Kentucky, some of whom had previously received prescriptions at the Slidell Urgent Care, came to the Philadelphia clinic for pain medication. The Kentucky patients traveled to the clinic in large groups, sometimes as many as 25 or 30 in a single day, despite the fact that it was nearly a ten-hour drive each way. Patients from Kentucky were charged $500 in cash for a monthly supply of medication, while local patients were only charged $200.

Dr. Crowder resigned after nearly three months on the job when a series of patients presented him with identical MRIs. He refused to treat the patients and told Ms. Snook to refund the patients their money. According to Snook, before Crowder left, she overheard a telephone conversation between Leman and Crowder, in which Leman told Crowder to "Take the * * * MRIs and write the prescriptions, or you won't get paid." [Transcript, RE 198, Page ID# 2293; *see* Transcript, RE 200, Page ID# 2888-89 (Crowder remembered speaking with Leman or Lyon after Snook handed him the phone, but not what the other person said).]

In June 2005, Dr. Randy Weiss replaced Crowder as the Urgent Care physician in Philadelphia. Weiss admitted that he was "taken aback" by the numerous patients from eastern Kentucky who pressured him to give them large dosages of medication. [*Id*., Page ID# 2665-68; *see* Transcript, RE 200, Page ID# 2739-41] However, he gave almost all of the patients prescriptions for 40 mg tablets of methadone, which he conceded were "excessive amount[s]." [Transcript, RE 199, Page ID# 2675-76]. Weiss did monitor patients for "doctor shopping" and ultimately dismissed 28 patients for presenting fake MRIs. [RE # 146, Page ID 987-89]

When Leman visited the Philadelphia clinic about a year after Weiss started, Weiss told Leman that he was "concerned about [the Kentucky patients] coming such a far distance, the differential in money between the $500 and the $200 payments, and the amount of the narcotics that they were receiving," which seemed "very high." [*Id*., Page ID# 2681.] Leman responded, "You don't really have to be concerned about what we're doing here" because "[e]ither they're going to have to put every doctor who writes pain prescriptions in jail, and therefore nobody * * * that needs pain medication will ever get it, or they're going to have to back off." [*Id*., Page ID# 2682.] Leman assured Weiss that "they're certainly going to back off." [*Id*.] Leman further asked Weiss, "[w]hat do you think they're going to do, come all the way from Kentucky to get you?" [Transcript, RE 200, Page ID# 2746.]

In August 2007, federal and state officers executed a search warrant at the Philadelphia clinic. Weiss agreed to surrender his DEA registration and to cooperate with the authorities. [Transcript, RE 199, Page ID# 2698-99; Transcript, RE 235, Page ID# 4085-86; *see id*., Page ID# 4223-24 (without a DEA registration, a doctor cannot write prescriptions for controlled substances).] At the officers' request, Weiss called Lyon, who subsequently informed Leman what had happened.

### B. Cincinnati Clinic

In May 2006, Leman opened a pain clinic in Cincinnati. With Leman's approval, Lyon hired Dr. Stan Naramore to work at the clinic. Naramore had previously been convicted of murder in Kansas, but his conviction was later overturned. When Naramore met with Leman and Lyon a few months after he started, Leman told Naramore that the other clinics prescribed methadone, Percocet, and Xanax, and that there was "no reason to change." [Transcript, RE 200, Page ID# 2772-74, 2860.] When Naramore questioned why patients were receiving both methadone and Percocet, which were both Schedule II pain medications, Leman told him that if he didn't want to prescribe what the other clinics had been prescribing, they could certainly find someone else who would. [*Id*., Page ID# 2773-75.] After his discussion with Leman, Naramore, who "desperately needed a job," prescribed methadone and Percocet to almost every patient. [Transcript, RE 200, Page ID# 2775 (Naramore thought he would be fired if he "did not prescribe those medications as [he] was instructed to prescribe them.").]

Leman set the fee for patient visits to the Cincinnati clinic at $400, payable in cash only. [Transcript, RE 200, Page ID# 2765.] Over 80% of the clinic's patients were from Kentucky, even though the clinic was a six- or seven-hour drive round trip from eastern Kentucky. [*Id*., Page ID# 2777-78; Transcript, RE 235, Page ID# 4165, 4181-4184.] Some patients had previously been seen at the Philadelphia Urgent Care, and some had been discharged from that clinic before coming to Cincinnati. [Transcript, RE 200, Page ID# 2854.]

State authorities executed a search warrant at the Cincinnati clinic in June 2007. A few days after the search, Naramore had a heart attack and underwent open heart surgery. When Naramore spoke to Leman after the search, Leman said that a former U.S. Attorney had reviewed the company's policies, and "there was no problem, there was nothing to worry about, and he

wanted [Naramore] to go right back and see patients again." [Transcript, RE 200, Page ID# 2813-2814.] The clinic reopened a few weeks later. [Transcript, RE 199, Page ID# 2515, 2517 (patients "came back right away").]

**II.**

*A. The District Court Properly Declined to Strike Tonia Snook's Testimony*

Leman asserts that the district court committed reversible error when it declined to strike the key government witness's testimony, or at least require the government to recall her as part of its case in chief when she allegedly perjured herself on the stand. We review this issue for abuse of discretion. *See United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995).

This Court has repeatedly explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995)). Leman concedes that the government did not knowingly present perjured testimony, but argues only that "it knew it at the conclusion of its case." [*See* Order, RE 160, Page ID# 1400]

To prove that a prosecutor's failure to correct false testimony violated due process rights, a defendant must demonstrate that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). Leman argues that Snook, the government's key witness, clearly perjured herself on the stand. To the extent that her testimony is merely inconsistent with that of other witnesses, he concedes that a question of credibility is presented for the jury to decide. *See, e.g.*, *United States v. Chavis*, 296 F.3d 450,

455 (6th Cir. 2002). But to the extent her testimony is knowingly and materially false, and to the extent that there is any reasonable likelihood that it could have affected the jury's judgment, he argues that its submission to the jury mandates a new trial. *Kyles*, 514 U.S. at 433 n.7; *Byrd*, 209 F.3d at 517. Snook was the prosecution's lead witness and her testimony was critical to the prosecution's case; the materiality of her statements is not in question. We analyze the remaining elements of the *Coe* test separately below.

*1) Leman has not proved that Snook's statements were indisputably false.*

Leman asserts that Snook made several fraudulent statements at trial, but has failed to establish that they were indisputably false. *See Coe*, 161 F.3d at 343 ("mere inconsistencies" do not show indisputable falsity).

The most significant of Leman's accusations involves the alleged forgery of a prescription in the name of Brenda Goble.[1] Snook testified that she wrote Brenda Goble's name on the prescription, but that the rest of the prescription was in Dr. Michael Rowland's handwriting and that the signature was Dr. Rowland's. Several days after Snook testified, Leman's counsel informed the court that he had compared Brenda Goble's April 26, 2005, prescription and progress report with a prescription and progress report for her father, Larry Goble, and had discovered that the two sets of records were "identical with the exception of the change of the name at the top." [Transcript, RE 202, Page ID# 3326-27.] Leman's counsel explained that "what we feel happened is that Tonia Snook and Larry and Brenda * * * forged these records" and moved to strike Snook's "entire testimony." [*Id.*, Page ID# 3327-28.] The court found that the records contained "identical * * * handwritten notations." [*Id.*, Page ID#

---

[1] Snook admitted that she had forged two other prescriptions, but denied forging Dr. Rowland's signature on Goble's prescription. [Transcript, RE 198, Page ID# 2317; see *id.*, Page ID# 2264.]

-6-

3329-3330; *see id*. at 3329 (prosecutor agreed that documents were "obviously overlaid on each other").]

The court rejected Leman's claim, however, concluding that it "sound[ed] like mostly a concern that you didn't get a chance to ask these questions because you didn't recognize the significance of documents in your possession," and stated that defense counsel could recall Snook and "ask her the questions you feel like you need to ask her in order to confront her in a manner that the system provides in order to try to get at the truth." [*Id.*, Page ID# 3389.]

Because Leman's counsel declined the court's invitation to cross-examine Snook, Leman cannot prove that the statements were indisputably false. While he relies on a series of compelling assumptions, these assumptions do not rise to the level of proof required for reversal of the district court's ruling. Because this Court is precluded from weighing the evidence, considering witness credibility, or substituting its judgment for that of the jury, *Chavis*, 296 F.3d at 455, Leman's assumptions and inferences that "Dr. Rowland would have had no reason to create a forgery," and that "[b]ecause the prescription is a forgery, and because Snook's story makes no sense, the only conclusion is that Snook lied," do not pass muster.

### 2) Did the prosecution know the statements were false?

Leman concedes that the government was unaware of Snook's perjury before it presented her as a witness but argues that it had an inherent responsibility to correct the perjured testimony once it became aware of the perjury. S*ee Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 270 (1959). The government responds by citing a line of cases that reject a due-process claim where both parties had access to the alleged perjury and "were in equal positions to clarify [the witness's] testimony." *Brooks v. Tennessee*, 626 F.3d 878, 896 (6th Cir. 2010); *United States v. Ward*, 190 F.3d 483, 491 (6th Cir. 1999) (rejecting claim that

government witness committed perjury where "the court gave the defendants several opportunities to cross-examine and recross-examine the witnesses to bring any inconsistencies in testimony to the attention of the jury"); *see also Norris v. Schotten,* 146 F.3d 314, 334–35 (6th Cir. 1998) (concluding that there is no *Brady* violation where the defense had in its possession evidence that demonstrated the witness's inconsistent statements, and remarking that "there would be no need for a jury if trials did not contain such inconsistencies").

Leman chose not to cross-examine Snook when given the opportunity to do so, presumably as trial strategy, and therefore may not claim error on appeal. Moreover, Leman presented his credibility claims to the jury and the district court instructed the jury that it could consider Snook's criminal conviction and evidence that she made a prior inconsistent statement in evaluating her credibility. [Transcript, RE 203, Page ID# 3622-23.] Leman cannot show that the prosecution knew Snook's statements to be false; the district court correctly rejected his claim.

### B. The District Court's Deliberate Ignorance Instruction Was Not an Abuse of Discretion

Leman challenges the district court's deliberate ignorance instruction to the jury, arguing that the evidence presented at trial was insufficient to prove that Leman had either actual knowledge or deliberate ignorance that the clinics were operating illegally. We review challenges to a district court's jury instructions for abuse of discretion. *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010). A trial court abuses its discretion if its instructions, taken as a whole, are confusing, misleading or prejudicial. *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999).

A deliberate ignorance instruction seeks to prevent a defendant from avoiding conviction by turning a blind eye to his obviously criminal conduct. *Geisen*, 612 F.3d at 486 (citing *United*

*States v. Gullett*, 713 F.2d 1203, 1212 (6th Cir. 1983)). Naturally, a correctly worded deliberate ignorance instruction, even when unsupported by the evidence, is harmless error if there is sufficient evidence for a jury to find that the defendant had *actual knowledge* of the illegal conduct. *See United States v. Rayborn*, 491 F.3d 513, 520-21 (6th Cir. 2007).

Here, the indictment charged Leman with conspiring with Lyon, Snook, Naramore, Weiss, and others to knowingly and intentionally distribute oxycodone and methadone. [Second Superseding Indictment, RE 123, Page ID# 491-492.] The district court's deliberate ignorance instruction mirrored the Sixth Circuit Pattern Criminal Jury Instruction 2.09:

> No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you're convinced that a defendant deliberately ignored a high probability that drugs were being distributed illegally or money was being laundered, then you may find that he knew that drugs were being distributed illegally or money was being laundered.
>
> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of the high probability that the drugs were being illegally distributed or money was being laundered, and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence on his part is not the same as knowledge, and it's not enough to convict. Again, this, of course, is all for you to decide.

[Transcript, RE 203, Page ID# 3610; *see* Sixth Circuit Pattern Criminal Jury Instruction 2.09 (virtually identical instruction).]

Leman essentially pleads indeliberate ignorance. He contends that: he owned several businesses, including several urgent care clinics; that he hired Steve Lyon as COO (and later CEO) to manage the clinics; and that the alleged wrongdoing only involved a small number of patients among hundreds of active patients in only two locations. He further contends that the clinics were providing a legitimate service to patients who were legitimately in pain, emphasizes

that neither Lyon nor himself ever told any of the physicians how to practice medicine, and argues that the clinics had effective checks in place to guard against patient fraud.

Unfortunately for Leman, the evidence belies his assertions—even assuming arguendo that the jury completely discredited Snook's testimony. That a large percentage of patients at both the Philadelphia and Cincinnati clinics drove for hours in large groups from eastern Kentucky and paid a higher cash price than local patients for prescription pain medications suggests that they were "drug seekers" instead of legitimate patients. [Transcript, RE 199, Page ID# 2643; *see* Transcript, RE 198, Page ID# 2398; Transcript, RE 199, Page ID# 2577, 2665-26, 2690-91; Transcript, RE 200, Page ID# 2777-78; Transcript, RE 235, Page ID# 4165, 4181-84.] Lyon himself testified that Leman "had to know that anybody that was driving 12 hours a day, passing up another six or seven states to go pay $500 cash to see a doctor, that that probably didn't pass the smell test." [Transcript, RE 199, Page ID# 2503-04, 2532-34, 2577.]

Likewise, Dr. Weiss testified that he raised his concerns about the Kentucky patients and the very high dosages of narcotics they were receiving with Leman, and that Leman responded that Weiss did not "have to be concerned about what we're doing here" because "[e]ither they're going to have to put every doctor who writes pain prescriptions in jail, and therefore nobody * * * that needs pain medication will ever get it, or they're going to have to back off." [Transcript, RE 199, Page ID# 2680-82.] Dr. Naramore also testified that Leman told him that other clinics prescribed both methadone and Percocet, that there was "no reason to change"; and that if he did not want to prescribe as the other clinics did, they could find someone else who would. [Transcript, RE 200, Page ID# 2772-75, 2860.]

Leman's attempts to legitimate his statements by arguing that they must be understood in the context of a boss "consol[ing] a shaken professional" or that he was simply reassuring the

doctors that they were using their "good faith medical judgment to prescribe pain medication to chronic pain suffers" are hopelessly unavailing. The district court's instruction could not have been an abuse of discretion as the evidence suggests that Leman had actual knowledge of the illegal conduct, and, at worst, was deliberately ignorant.

### C. The District Court's Money Laundering Instruction Did Not Constitute Reversible Error.

Leman argues that the district court committed two reversible errors in its money laundering instruction: 1) erring in its pronouncement of the instruction; and 2) refusing to instruct the jury that "proceeds" means "profits." Leman did not object to the instruction at the time it was given. Therefore, our review is limited to plain error. *United States v. Morrow*, 977 F.2d 222, 226 (6th Cir. 1992). The plain-error doctrine governs those "circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985); *Morrow*, 977 F.2d at 226. "[P]lain error is an error that is clear or obvious, and if it affects substantial rights, it may be noticed by an appellate court." *United States v. Oliver*, 397 F.3d 369, 375 (6th Cir. 2004) (citing *United States v. Barajas-Nunez*, 91 F.3d 826, 830 (6th Cir. 1996)) (internal quotation marks omitted).

We need not assess Leman's second argument in any detail, as he concedes that his interpretation is foreclosed by this Court's decision in *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009). As to Leman's contention that the court erred in its pronouncement of the jury instruction on the money laundering count, Leman is correct; the district court clearly erred in its pronouncement of the jury instruction on the money laundering count.

The pattern jury instruction provides that "The Government does not have to prove the defendant knew the property involved represented proceeds of a felony *as long as he knew the property involved represented proceeds of some form of unlawful activity*." Sixth Circuit Pattern

Jury Instruction 11.01 (emphasis added). The district court errantly skipped one line of the pattern jury instruction, however, when it stated: "The Government does not have to prove that the defendant knew the property involved represented proceeds of some form of unlawful activity." [RE # 164, Page ID 1535.] The correct jury instruction required that the defendant must have known that the property involved represented proceeds of some form of unlawful activity; whether that unlawful activity was a misdemeanor or a felony was irrelevant. The Court completely flipped the standard, however, by removing knowledge as a necessary element, thereby potentially allowing the jury to convict Leman for lawful activity.

The question here is whether the error affected Leman's substantial rights. "For an error to have affected a defendant's substantial rights, '[i]t must have affected the outcome of the district court proceedings.'" *United States v. Vasilakos*, 508 F.3d 401, 412 (6th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). We agree with the district court that once the jury found that Leman knew that the clinics were distributing drugs illegally, it could not rationally fail to find that he knew that the property involved in the financial transactions was the proceeds of that unlawful activity. [*See* Memorandum Opinion and Order, RE 282, Page ID# 4670 (finding it "highly unlikely" that the jury would have found Leman guilty of "the predicate offense, conspiracy to distribute oxycodone and methadone," without also finding that he was "guilty of the conspiracy to commit money laundering resulting from the distribution of those controlled substances").] Leman has not demonstrated that the court's clear error in pronouncing the jury instruction affected the jury's verdict, and therefore, the court's error is not reversible.

*D. The District Court Did Not Err in Imposing Community Restitution.*

Leman lastly asserts that the district court's community restitution order violated 18 U.S.C. § 3663, by ordering him to pay $1 million without ordering a fine. Because Leman

did not object to the restitution order at sentencing, this Court reviews his claim only for plain error. *United States v. Rozin*, 664 F.3d 1052, 1066 (6th Cir. 2012).

Under 18 U.S.C. § 3663(c), a district court sentencing a defendant for a drug offense "in which there is no identifiable victim" may order the defendant to pay community restitution, "based on the amount of public harm caused by the offense," to specified state entities. *See* 18 U.S.C. § 3663(c)(1), (c)(2)(A), (c)(3). Pursuant to this provision, the district court ordered Leman to pay $1 million in community restitution. The court did not impose a separate fine.

Leman contends that the district court cannot impose a community restitution award that exceeds the amount of the fine imposed. This argument is patently inconsistent with the plain language of 18 U.S.C. § 3663(c)(2)(B), which provides that "[i]n no case shall the amount of restitution ordered under this subsection exceed the amount of the fine *which may be ordered* for the offense charged in the case." (emphasis added). The maximum fine "which may be ordered" for Leman's drug conspiracy offense was $1 million, *see* 21 U.S.C. § 841(b)(1)(C), and the community restitution ordered did not exceed that amount.

We **AFFIRM** both the conviction and the restitution order.